FILED

2020 Jul-15  AM 11:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RONALD KING, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:19-CV-01115-KOB** |
| | ) | |
| **UA LOCAL 91, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

This employment-discrimination case comes before the court on a motion to dismiss filed

by Defendants Day and Zimmermann, Inc. and Day and Zimmermann NPS, Inc. (collectively,

"D&Z"). (Doc. 35.) The Amended Complaint in this case alleges that D&Z and two other

Defendants violated Title VII of the Civil Rights Act of 1964 by discriminating against five

named Plaintiffs and a putative class of Defendants' black employees. The instant motion asks

the court to both dismiss the Amended Complaint and decline to certify Plaintiffs' proposed

class. For the reasons explained below, the court WILL GRANT D&Z's motion.

**Background**

Defendant D&Z is a nationwide engineering, construction, and munitions company that

also "specializes in the general maintenance of power and industrial facilities, including nuclear

and fossil electric generating plants." (Doc 30 at 4.) When one of D&Z's client's power plants

experiences an outage or undergoes routine maintenance, D&Z sends Union-referred employees

to the power plant to work on the plant's equipment. D&Z "operates on client property and

conducts hires/layoffs of its employees for temporary periods of time which are usually tied

1

directly to plant outages and shutdowns." *Id.* D&Z is generally contractually obligated to hire Union members for "craft positions," such as pipefitters, welders, boilermakers, carpenters, and bricklayers. And D&Z hires craftsmen for work on power plants in Alabama through referrals from the two Union Defendants in this case: United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada as well as its northern-Alabama affiliate, UA Local 91. The employment relationships between the Union-referred workers and D&Z is inherently temporary, as the contracts "typically last[] several weeks or months." *Id.*

The five named Plaintiffs are journeymen pipefitters and welders who have been members of Defendant UA Local 91 for more than ten years; each has intermittently worked for D&Z on maintenance and construction sites on properties owned and operated by Southern Company (including its subsidiaries Alabama Power, Georgia Power, Mississippi Power, and Southern Power). "Plaintiffs obtained such positions with Day and Zimmermann and other contractors pursuant to the Defendant Unions' hiring hall relationships with the Southern Company and/or other companies who utilize the Defendant Unions' hiring hall referral system." (*Id.* at 6.) All five named Plaintiffs are black males.

According to the Amended Complaint, the referral and selection process begins with D&Z submitting a requisition form called a "manpower request" to the local Union. *Id.* "Once the trade unions receive the manpower requests, their respective hiring halls nominate the particular union members and tradesmen to be referred to Day and Zimmermann for that outage by transmitting a 'referral list.'" *Id.* The Union also nominates foremen and other supervisory personnel for each job. "If the union does not nominate a member for referral to a foreman, general foreman or other leadership position, Day and Zimmermann may 'step-up' someone for

such jobs. Such 'step-up' decisions are made by Day and Zimmermann's site manager or the site manager and a craft supervisor." (*Id.* at 7.)

Although the Union Defendants referred—and D&Z selected—both leadership and laborer positions in *ad hoc* fashion for each job, Plaintiffs allege that D&Z employed three selection criteria in filling leadership positions when the Union failed to nominate anyone: "prior experience," "leadership," and "absenteeism." *Id.* Plaintiffs allege that over the last ten years, the number of black foremen has been "substantially disproportionate" to the number of eligible applicants. (*Id.* at 9.) Plaintiffs allege that black Union members were caught in a cycle of exclusion because Defendants used two of the three criteria—"prior experience" and "leadership"—to perpetually refer and select members of a mostly white in-group. Furthermore, Plaintiffs allege that Defendants engaged in a "word-of-mouth" selection practice "without posting or announcing the opportunity to apply for such positions, and without providing an application or competitive bidding and selection process." (*Id.* at 13.) Plaintiffs also allege that Defendants created a culture of nepotism, as white Union members' family members often received positions over equally qualified black Union members. Ultimately, "[d]espite Plaintiffs' qualifications and interest, they were not referred or selected for any of the leadership and/or supervisory positions or opportunities they were interested in filling." (Doc. 30 at 16.)

Two of the named Plaintiffs, Chris Samuel and Nolan Jones, also allege that Defendants engaged in unlawful retaliation. Specifically, Plaintiffs allege that D&Z (a) removed Mr. Samuel from his newly attained foreman position shortly after he filed a discrimination action with the Equal Employment Opportunity Commission (Doc. 30 at 16–18); and (b) fired Mr. Jones from his job as "a pretext for racial discrimination and retaliation." (*Id.* at 18.)

Based on these alleged facts, Plaintiffs bring the following three claims under Title VII: (I) disparate impact, (II) disparate treatment, and (III) retaliation. Plaintiffs assert these claims on behalf of themselves and a putative class defined as follows:

> all current and former African American members of the United Association of Journeymen & Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada and/or its local union and affiliate, Local 91, during the limitations period applicable to this case, and all current and former African American pipefitters and welders employed by Day and Zimmermann during that same limitations period, including, without limitation, all current and former African American journeymen and apprentice pipefitters and welders.

(*Id.* at 19.)

Plaintiffs seek the following remedies for themselves, personally, and on behalf of the putative class: (1) a declaratory judgment that Defendants systemically discriminated against black persons by limiting their employment to inferior jobs; (2) a permanent injunction against continuing discrimination; (3) a "restructuring of Defendants' selection procedures so that African Americans are able to learn about and fairly compete in the future for better jobs traditionally enjoyed by white employees"; (4) a "restructuring of Defendants' referral, recruitment and selection procedures to prevent further racial discrimination and disparate impact" (*id.*); (5) "[a]n Order restoring the named Plaintiffs and the class they seek to represent to the jobs they would now be occupying but for Defendants' discriminatory practices"; (6) "[a]n Order requiring Defendants to initiate and implement systems of assigning, training, transferring, compensating, and promoting African American employees in a non-discriminatory manner"; (7) "[a]n Order directing Defendants to adjust the wages and benefits of the named Plaintiffs and the class they seek to represent to the level that they would now be enjoying but for Defendants' discriminatory practices"; (8)"[a]n Order requiring Defendants to initiate and implement programs that provide (i) equal employment opportunities for African American members and

employees; (ii) remedy the effect of Defendants' past and present unlawful employment practices; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above"; (9) "[a]n Order establishing a task force on equality and fairness to determine the effectiveness of the foregoing programs and remedies, including, but not limited to monitoring and reporting compliance and effectiveness of such programs and remedies"; and (10) damages, attorneys' fees, and costs. (Doc. 30 at 20, 33, 34.)

Plaintiffs filed the operative Amended Complaint on November 13, 2019. (Doc. 30.) The two Union Defendants each filed answers to the Amended Complaint on December 18, 2019 (Docs. 34, 36). D&Z filed the instant motion to dismiss on December 18, 2019 (Doc. 35), to which Plaintiffs responded on January 22, 2020 (Doc. 41) and D&Z replied on January 29, 2020. (Doc. 42.)

Although the Parties discuss multiple issues in their briefing, the three central matters concern (a) whether the Amended Complaint is a shotgun pleading; (b) whether the pleadings and briefs regarding the instant motion provide the court with sufficient information to consider class certification; and (c) whether the Amended Complaint plausibly alleges a certifiable class.

**Standards**

D&Z brings the instant motion primarily under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint, and in this case, D&Z contends that Plaintiffs' class claims are legally insufficient because the Amended Complaint fails to plausibly allege the required elements of class claims under Federal Rule of Civil Procedure 23.

The Supreme Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting and explaining its decision in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To be plausible on its face, the claim must contain enough facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Supreme Court has identified two working principles for the district court to use in applying the facial plausibility standard. The first principle is that, in evaluating motions to dismiss, the court must assume the veracity of well-pled factual allegations; however, the court does not have to accept as true legal conclusions even when "couched as [] factual allegation[s]" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The second principle is that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, under prong one, the court determines the factual allegations that are well-pled and assumes their veracity, and then proceeds, under prong two, to determine the claim's plausibility given the well-pled facts. That task is "context-specific" and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Id.* If the court determines that well-pled facts, accepted as true, do not state a claim that is plausible, the claim must be dismissed. *Id.*

In a footnote, D&Z also argues in the alternative that the court should strike or dismiss Plaintiffs' class allegations under Federal Rules of Civil Procedure 12(f) or 23(d)(1)(D). (Doc.

35 at 16.) Rule 12(f) permits a court, on its own or pursuant to a motion, to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." And Rule 23(d)(1)(D) gives a court authority to "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." D&Z concludes, without expressly tying either Rule 12(f) or Rule 23(d)(1)(D) to the instant facts, that "whether analyzed as a Rule 12(f) or Rule 23(d) motion to strike, or a Rule 12(b)(6) motion to dismiss, the DZ Defendants submit that the result is the same: Plaintiffs' class claims should not proceed past this Motion." (Doc. 35 at 16.)

Because, as explained below, Plaintiffs' class claims fail under Rule 12(b)(6) because the Amended Complaint does not plausibly allege facts that satisfy Rules 23(a) and 23(b), the court need not consider D&Z's alternative arguments under Rule 12(f) or Rule 23(d).

Lastly, D&Z's contention that the Amended Complaint is a shotgun pleading requires the court to apply Federal Rules of Civil Procedure 8 and 10. Shotgun pleadings often violate Rule 8, which requires that complaints provide defendants with notice of each claim as well as the basic facts that support each claim. *Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 610 (11th Cir. 2008). And Rule 10, which regulates the organization of pleadings, works in conjunction with Rule 8 "so that [the plaintiff's] adversary can discern what he is claiming and frame a responsive pleading." *Id. See also Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015) ("'Shotgun' pleadings, calculated to confuse the 'enemy,' and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked, are flatly forbidden by the [spirit], if not the [letter], of [Rules 8 and 10]") (citation omitted). In short, the hallmark of a shotgun pleading—whether intentionally crafted or shoddily drafted—is confusion among both defendants and trial courts.

**Analysis**

The Parties' briefing in this case reveals three primary disagreements for the court to resolve: (a) whether the Amended Complaint is an impermissible shotgun pleading that violates Fed. R. Civ. P. 8; (b) whether a pre-discovery dispositive motion presents an appropriate procedural vehicle for the court to evaluate certification of Plaintiffs' proposed class; and (c) whether the Amended Complaint plausibly alleges all elements of class certification pursuant to Fed. R. Civ. P. 23. The court addresses each argument below.

### *Shotgun Pleading*

D&Z's motion to dismiss argues that Plaintiffs' Amended Complaint is a shotgun pleading. (Doc. 35 at 30–33.) The Eleventh Circuit recognizes four types of shotgun pleadings. The first type includes "multiple counts where each count adopts the allegations of all preceding counts"; the second includes "conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; the third type fails to separate "into a different count each cause of action or claim for relief"; and the fourth asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against"). *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id. See generally* Fed. R. Civ. P. 8, 10.

In this case, the court agrees with D&Z that the Amended Complaint is an impermissible shotgun complaint because it features "vague," non-specific facts and levels "multiple claims

against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." *See Weiland*, 792 F.3d at 1323.

Plaintiffs sue four Defendants, broken down into two groups: two Union Defendants and two D&Z Defendants. At certain points, the Amended Complaint clearly articulates which facts apply to which Defendant or group of Defendants. For example, Plaintiffs specifically assert that D&Z's site managers and craft supervisors considered certain selection criteria when "stepping up" foremen (Doc. 30 at 7), and that the Union Defendants (but apparently not D&Z) displayed the "Confederate Flag as an official part of the Union's meetings." *Id.* at 12. But such clarity within the Amended Complaint is the exception rather than the rule.

Most notably, the Amended Complaint regularly refers to "Defendants" without specifying which of the four Defendants (or group of Defendants) committed the alleged wrong. (*See, e.g.*, Doc. 30 at 3, 10, 12, 13, 16, 22, 24, 25, 26, 27, 28, 33). Plaintiffs' practice of referring to all Defendants, generally, is especially confusing given that Plaintiffs allege that the two groups of Defendants performed mostly distinct, non-overlapping functions. For example, Plaintiffs allege that "Defendants followed a custom and practice of reserving and/or filling such leadership and supervisory positions for Caucasians by refusing to post or announce vacancies." (Doc 30 at 13.) But, as Plaintiffs describe the referral and selection process, D&Z had no anticipatory role to fill any position except to send a manpower request to the local Union, and D&Z employees only "stepped up" foremen when the Union failed to do so. (*Id.* at 6–7.) Accordingly, the court cannot reconcile Plaintiffs' apparent contention that all Defendants, generally, should be held liable for illegally "reserving," "posting," and "announcing" vacancies over which the D&Z Defendants had no input or control.

The Amended Complaint also pervasively features passive-voice sentences that further obscure the identities of the alleged wrongdoers. *See, e.g.,* Doc. 30 at 9 ("referrals or appointments to foreman and general foreman were substantially disproportionate"); ("referrals and appointments were limited"); ("African Americans were . . . denied the opportunity"); 10 ("Plaintiffs and the class they represent were denied the opportunity"); ("Defendants' referrals and appointments of foremen and general foremen were also based on nepotism practices"); and 14 ("African American union members and employees were disproportionately excluded.")) And on the several occasions when the Amended Complaint specifically names individual foremen who Defendants referred and selected, the Plaintiffs fail to specify *which* Defendant(s) placed the individuals in their positions. (*Id.* at 9–11.)

Plaintiffs' proposed class definition further exacerbates the confusion about which alleged facts apply to whom. Plaintiffs define the class as "all current and former African American members of the [Union], during the limitations period applicable to this case, and all current and former African American pipefitters and welders employed by Day and Zimmermann during that same limitations period, including, without limitation, all current and former African American journeymen and apprentice pipefitters and welders." (Doc. 30 at 19.)

Despite Plaintiffs' contention that the Amended Complaint "does not allege two separate classes, one for the Union Defendants and a separate one for DZ" (Doc. 41 at 39), the class definition appears to describe two discrete sets of persons: (1) black Union members and (2) black welders and pipefitters employed by D&Z. Although the Venn diagram of these two sets likely features significant overlap (and one set may in fact be a strict subset of another), the court does not believe, and Plaintiffs have not represented, that the two sets are identical. The lack of uniformity between these two sets, along with the fact that both groups of Defendants play

different roles within the referral and selection process, creates confusion not only regarding the Defendants' alleged actions, but also regarding persons within the proposed class of Plaintiffs and their relationships with the Defendants.

The Amended Complaint's lack of clarity pervades not only allegations supporting Plaintiffs' disparate impact and disparate treatment claims (Counts I and II, respectively), but also their retaliation claim (Count III). In places, the Amended Complaint seems to allege that the retaliation claim applies not only to the two named Plaintiffs who were allegedly terminated pursuant to an EEOC claim, but also to the putative class as a whole. *See, e.g.,* Doc. 30 at 18–19 (describing the alleged retaliation against the two named Plaintiffs as a practice that "deprive[s] Plaintiffs and other African Americans of the opportunity to work in a race neutral environment and to supervise and/or be supervised by African Americans on the same basis as non-African Americans. Such pattern or practice of racial discrimination adversely affects *me* and other African American members/employees, applicants and potential members/employees *as a class* on an ongoing basis") (emphasis added).

Because not all potential Plaintiffs, as described in the class definition, were or are associated with both groups of Defendants; because not all claims apply to both groups of Defendants; and because the Amended Complaint is vague as to which allegations apply to which Parties, the court WILL DISMISS without prejudice as to D&Z only the Amended Complaint as an impermissible shotgun pleading.

### The Timing of Class Certification

In response to the instant motion, Plaintiffs contend that a "motion to dismiss on the pleadings is not the proper means to deciding whether [a plaintiff has] established the elements

of Rule 23 necessary to certify a class." (Doc. 41 at 13.) Instead, Plaintiffs argue, courts should permit discovery to determine whether a class is certifiable.

The relevant procedural rule gives district courts broad discretion concerning when to address the class certification issue. Federal Rule of Civil Procedure 23(c)(1)(A) states that, "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). This rule "demands an early consideration of class certification, including its practical implications for case manageability." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1279 (11th Cir. 2009).

To support the general assertion that discovery is always necessary for a district court to properly evaluate class certifiability, Plaintiffs rely on cases such as *Herrera v. JFK Med. Ctr., L.P.*, 648 Fed. App'x. 930, 934 (11th Cir. 2016), in which the Eleventh Circuit opined that class certification "*usually* should be predicated on more information than the complaint itself affords. The court *may*, and *often* does, permit discovery relating to the issues involved in maintainability, and a preliminary evidentiary hearing may be appropriate or essential." *Id.* (internal citations omitted; emphasis added). But the Circuit Court's use of the qualified language "usually," "may," and "often" clearly demonstrates that class-related discovery is not required for every complaint that proposes a class action. *See also Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("the class determination *generally* involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action") (emphasis added).

Whether a district court should address class certification pursuant to a motion to dismiss turns in large part on the facial plausibility of the putative class action complaint. As the

Supreme Court explained, "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.*

If a complaint plausibly alleges that class certification is appropriate, the district court should hold an evidentiary hearing or permit discovery to ascertain the propriety of certifying the proposed class. *Huff v. N.D. Cass Co. of Ala.*, 485 F.2d 710, 713 (5th Cir. 1973). *See Bonner v. Prichard*, 661 F. 2d 1206, 1209 (adopting all decisions of the former Fifth Circuit announced prior to October 1, 1981, as binding precedent in the new Eleventh Circuit). But if a complaint facially fails to plausibly allege the necessary elements of class certification, pursuing class-related discovery is unnecessary. *See Bohannan v. Innovak Int'l*, 318 F.R.D. 525, 529 (M.D. Ala. 2016) ("nothing in Rule 23 precludes the consideration of class certification issues in the context of a motion to dismiss. . . . The relevant inquiry here is whether the allegations are sufficient to plausibly support the existence of an ascertainable class.") *See also Stepanovich v. City of Naples*, 728 F. App'x 891, 903 (11th Cir. 2018) ("[A]voiding the imposition of discovery on facially implausible claims is one of the key functions of 12(b)(6)") (citing *Twombly*, 550 U.S. at 558).

Plaintiffs also cite to *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008) for the proposition that "[a]n evidentiary hearing is particularly necessary when the Defendant, as here, argues facts that are not part of the record and are the opposite of those in the Complaint." (Doc. 41 at 15.) Although Plaintiffs accurately articulate one of the holdings in *Mills*, they misconstrue D&Z's motion to dismiss and accompanying brief. The Eleventh Circuit in *Mills* indeed determined that evidentiary hearings are usually necessary when the parties disagree over

basic facts; specifically, the Circuit Court held that a district court should not have denied class certification pursuant to a motion to dismiss in large part because the "vastly differing claims of the parties" in the pleading documents demonstrated the need for limited discovery. *Mills*, 511 F.3d at 1311. But just as factual disputes heighten the need for class-related discovery, the absence of disputed facts diminishes the need for such discovery.

Here, and contrary to Plaintiffs' assertions, D&Z does *not* contest any facts presented in the Amended Complaint. In fact, D&Z expressly states as much, agreeing that, for the purposes of the motion, D&Z "accept[s] as true the relevant factual allegations of the Amended Complaint" and then summarizing Plaintiffs' basic facts and allegations. (Doc. 35 at 12–15.) Nor did D&Z introduce any additional facts in its briefs supporting the instant motion to dismiss. (Docs. 35, 42.) So unlike *Mills*, which featured "vastly differing claims" as to the facts, the absence of contested facts in this case only further underscores the propriety of evaluating class certification at the motion to dismiss stage. The court further notes that the court in *Mills* re-affirmed that, "[i]n some instances, the propriety *vel non* of class certification can be gleaned from the face of the pleadings." *Mills*, 511 F.3d at 1309.

In this case, the relevant issue is whether Plaintiffs have adequately alleged a certifiable class under Federal Rule of Civil Procedure 23. *See Hudson v. Delta Air Lines*, 90 F.3d 451, 457 (11th Cir. 1996) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") Because neither discovery nor an evidentiary hearing would help answer this question, the court finds that "the issues are plain enough from the pleadings"—as discussed below—to address the matter of class certification pursuant to the instant motion to dismiss. *See Falcon*, 457 U.S. at 160.

14

### Class Certification under Rule 23

The court begins by recognizing that "the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." *Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1233 (11th Cir. 2016). Based on this presumption, the initial burden of establishing a certifiable class rests on the parties advocating for the class. *Jones v. Diamond*, 519 F.2d 1090, 1099 (5th Cir. 1975) (rev'd on other grounds, *Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478, 479 n.2 (1978)). *See Bonner*, 661 F. 2d at 1209 (adopting for the new Eleventh Circuit all former Fifth Circuit precedent).  Plaintiffs satisfy this burden only if they meet all four requirements of Federal Rule of Civil Procedure 23(a) *and* at least one alternative requirement of Federal Rule of Civil Procedure 23(b). *Rutstein v. Avis Rent-A-Car Sys.*, 211 F.3d 1228, 1233 (11th Cir. 2000).

The four requirements for class certification under Rule 23(a) are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *Calderone v. Scott*, 838 F.3d 1101, 1104 (11th Cir. 2016). And the relevant alternatives under Rule 23(b) permit class certification either if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2), *or* if "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

D&Z's motion to dismiss contends that Plaintiffs have failed to plausibly allege commonality, typicality and adequacy under Rule 23(a) and both alternatives under Rule 23(b).

The Supreme Court explained that the "commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157–58 (1982). Often, courts will either consider commonality and typicality simultaneously or analyze commonality first and then find that addressing the remaining elements under Rule 23(a) is unnecessary. *See, e.g., Hudson v. Delta Air Lines*, 90 F.3d 451, 456 (11th Cir. 1996); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011).

The court follows this general template here and finds that, for the reasons explained below, because Plaintiffs fail to satisfy the commonality element under Rule 23(a)(2), the court need not separately analyze typicality or adequacy under Rules 23(a)(3) and 23(a)(4). *See Wal-Mart*, 564 U.S. at 349 ("In light of our disposition of the commonality question, however, it is unnecessary to resolve whether respondents have satisfied the typicality and adequate-representation requirements of Rule 23(a).") The court will analyze Rule 23(a)(2) commonality, as well as the two alternative requirements under Rule 23(b), in turn.

a. *Rule 23(a)(2) Commonality*

Federal Rule of Civil Procedure 23(a)(2) requires a putative class to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The U.S. Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) provides the paradigmatic explanation of Rule 23(a)(2)'s contours, and the Parties in this case devote almost as much space in their briefs arguing over *Wal-Mart* than all the other cited cases combined. For this reason, the court will describe the facts and holdings of *Wal-Mart* at length.

16

*Wal-Mart* featured three named plaintiffs who sued on behalf of themselves and a putative nationwide class of roughly 1.5 million then-current and former female employees of Wal-Mart; the plaintiffs alleged that the retail giant violated Title VII of the Civil Rights Act of 1964 because local managers disproportionately exercised their pay and promotion discretion in favor of men, which created an unlawful disparate impact on female employees. *Wal-Mart*, 564 U.S. at 343. The plaintiffs also argued that Wal-Mart's refusal to control its managers' discretion constituted unlawful disparate treatment. The district court certified the class—later affirmed by a circuit court—defined as "all women employed at any Wal-Mart domestic retail store at any time since December 26, 1998 who have been or may be subjected to Wal-Mart's challenged pay and management track promotions policies and practices." *Id*. at 346.

The plaintiffs asserted "that a strong and uniform 'corporate culture' permit[ted] bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice." *Id.* at 345. To demonstrate questions of law and fact common to all the women of Wal-Mart, plaintiffs provided "statistical evidence about pay and promotion disparities between men and women at the company, anecdotal reports of discrimination from about 120 of Wal-Mart's female employees, and the testimony of a sociologist." *Id.*

The Supreme Court granted certiorari in large part to clarify the meaning of commonality under Rule 23(a)(2). *Id.* at 349. The Court began its opinion by explaining that the commonality element requires all putative class members to share not only common *questions* of law or fact, but also common *claims*. "[C]laims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention,

moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. "What matters to class certification is not the raising of common 'questions'—even in droves—but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* at 350 (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N. Y. U. L. Rev. 97, 132 (2009)).

The Supreme Court then explained that, in the Title VII context, class-seeking plaintiffs must ordinarily illustrate commonality using either of two pathways. Plaintiffs can either (a) show that the employer used "a biased testing procedure to evaluate . . . applicants," or (b) provide "significant proof that an employer operated under a general policy of discrimination." *Id.* at 353.

For the putative class of Wal-Mart employees, the Court determined that the first pathway did not apply because Wal-Mart used no "testing procedure or other companywide evaluation method." *Id.* Similarly, the second pathway was also inapplicable because the only clear policy that the plaintiffs established was "Wal-Mart's 'policy' of allowing discretion by local supervisors over employment matters." But this policy of discretion "is just the opposite of a uniform employment practice that would provide the commonality needed for a class action." *Id.* at 355.

The Court explained that, "in appropriate cases, giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—since an employer's undisciplined system of subjective decisionmaking can have precisely the same

18

effects as a system pervaded by impermissible intentional discrimination." *Id.* at 355. But the Court hastened to add that such "appropriate cases" are *individual* claims, not class action cases, because "one manager's use of discretion will do nothing to demonstrate the invalidity of another's." *Id.* at 356–57. *See also id.* at 350 (explaining that claims of a "disparate-impact Title VII injury . . . must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the *same* supervisor") (emphasis added). In cases involving multiple managers, plaintiffs must show a "specific employment practice," such as a "biased testing procedure" or "general policy of discrimination" that connects each managers' decision-making. *Id.* at 353, 357 (citations omitted.)

The Court explained that the putative class "wish[ed] to sue about literally millions of employment decisions at once. Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* at 352. Ultimately, the Court concluded that because "[p]ay and promotion decisions at Wal-Mart are generally committed to local managers' broad discretion, which is exercised in a largely subjective manner," the plaintiffs failed to satisfy the commonality requirement under Rule 23(a)(2). *Id.* at 343 (internal citation omitted).

The Parties in this case disagree over whether the discrimination described in the Amended Complaint was individualized and discretionary, as in *Wal-Mart*, or was instead based on uniform corporate policy. Plaintiffs argue that their disparate impact claim is nothing like the disparate impact claim in *Wal-Mart* because Plaintiffs here challenge D&Z's corporate policies instituted by the company itself, not the "localized, supervisory discretion," of any individual D&Z supervisor or manager. (Doc. 41 at 24.)

As the Court explained in *Wal-Mart,* individualized decision-making virtually precludes

class certification for both disparate impact and disparate treatment claims because

> [when] left to their own devices most managers in any corporation . . . would select
> [race]-neutral, performance-based criteria for hiring and promotion that produce no
> actionable disparity at all. Others may choose to reward various attributes that
> produce disparate impact—such as scores on general aptitude tests or educational
> achievements. And still other managers may be guilty of intentional discrimination
> that produces a [race]-based disparity. In such a company, demonstrating the
> invalidity of one manager's use of discretion will do nothing to demonstrate the
> invalidity of another's. A party seeking to certify a nationwide class will be unable
> to show that all the employees' Title VII claims will in fact depend on the answers
> to common questions.

*Wal-Mart*, 564 U.S. at 355–56.

Where, as here, a set of plaintiffs seeks to certify a disparate impact class based on

"corporate policies and practices" (Doc. 41 at 24), the plaintiffs must plausibly identify an

objective, facially neutral but *de facto* biased testing procedure that systematically discriminates

against the alleged class. *See Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d

1566, 1570 n.10 (11th Cir. 1992). In this case, the Parties agree that the referral and selection

"process for both leadership and journeymen positions occurred separately" for every job. (Doc.

30 at 7.) Although the Parties provide no numerical estimate of how many referral and selection

decisions the Defendant Unions or D&Z made over the last ten years, the court can safely

assume that, similar to *Wal-Mart*, Plaintiffs are attempting to litigate potentially hundreds of

discrete managerial decisions *at once*. *See Wal-Mart,* 564 U.S. at 352.

And as for company-wide procedures, Plaintiffs aver that D&Z's "practices"

> includ[e], but [are] not limited to, use of 'prior experience' and 'leadership' referral
> and selection and [sic] criteria[;] nepotism practices[;] refusal to post or announce
> vacancies or employment opportunities . . . reliance upon procedures and criteria
> which permit and encourage the incorporation of racial stereotypes and bias of the
> Defendants' predominantly white managerial staff; refusal to establish or follow
> policies, procedures, or criteria that reduce or eliminate disparate impact and/or
> intentional racial bias or stereotypes in such defendants' decision making process;

> pre-selection of whites before vacancies or opportunities became known; and discouragement of applications and expressions of interest by African Americans through a reputation for racial bias, racially hostile conditions of work. [sic] and unequal terms and conditions of employment in such areas as work hours and position assignments.

Doc. 30 at 24–25 (numerals omitted).

Although many of these allegations, standing alone, may be actionable for *individuals* bringing Title VII disparate impact claims, the sheer variety and inherently discretionary nature of these ostensible practices underscores the lack of commonality among D&Z's hundreds of referral and placement decisions over the last decade.

Among Plaintiffs' many contentions, the alleged practice most resembling a common corporate policy is Plaintiffs' assertion that some D&Z supervisors weighed the factors of candidates' "leadership" and "prior experience" when selecting step-up positions. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 159 n.15 (1982) (noting that an employer's use of a "biased testing procedure to evaluate" applicants would satisfy Rule 23(a)(2)). But the concepts of "leadership" and "prior experience" are malleable and subject a vast spectrum of private interpretation—a far cry from the objective "testing procedures" described by the Supreme Court, such as "scores on general aptitude tests or educational achievements."  *Wal-Mart*, 564 U.S. at 355.

Although Plaintiffs cite to several cases to support the proposition that some supervisors' considering of "leadership" and "prior experience" is a biased testing procedure, each case is factually distinguishable from the instant case. For example, in the disparate-impact case *Walker v. Jefferson Cty. Home*, 726 F.2d 1554, 1558 (11th Cir. 1984)) the Eleventh Circuit found that an organization's requirements of a high school education and prior supervisory experience,

although facially neutral, were discriminatory because the organization previously had a policy that excluded black persons from attaining supervisory experience. *Id.*

Similarly, in *Craig v. Ala. State Univ.*, 804 F.2d 682, 686 (11th Cir. 1986), the Eleventh Circuit held that a historically black university's policy of hiring from within created a disparate impact on a white applicant because the university had a previous policy of preferring black employees.

Lastly, in the only post-*Wal-Mart* case to which Plaintiffs cite on the issue,[1] the 4th Circuit Court of Appeals examined a corporation's four "company-wide practices: (1) a salary range policy; (2) a pay raise percentage policy; (3) a 'built-in headwinds' policy; and (4) dual pay system for hirees and promotes." *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 116–17 (4th Cir. 2013). In its opinion remanding the case to allow the plaintiffs to amend their complaint and the district court to consider class certification, the Fourth Circuit explained:

> [w]e do not now rule on the sufficiency of the allegations of the proposed amended complaint concerning the company-wide policies or on whether certification of the putative class will ultimately be warranted. However, in considering whether amendment of the complaint would be futile, we observe that the proposed amended complaint's allegations of uniform corporate policies and of high-level corporate decision-making are substantively different from those that the Supreme Court held sufficient in *Wal-Mart*. For instance, the dual pay policy referenced in the proposed amended complaint is a company-wide policy that is in place in all

---

[1] At one point, Plaintiffs also appear to argue that the Supreme Court's 2016 decision in *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) demonstrates that the Amended Complaint's allegations include *de jure*, top-down, discriminatory corporate polices to satisfy the commonality requirement under Fed. R. Civ. P. 23(a)(2). (Doc. 41 at 23.) But the Court in *Tyson* contemplated a Fair Labor Standards Act claim, not a Title VII claim, and the challenge to class certification occurred in the context of Fed. R. Civ. P. 23(b), not 23(a). Furthermore, the relevant issue in *Tyson* was not whether a corporate policy existed; the Court determined that the defendant meat-processing company's uniform requirement that its workers wear protective gear was indeed a corporate policy, and the parties did "not dispute that there [were] important questions common to all class members." *Id.* at 1045-46. Instead, the relevant issue in *Tyson* was the entirely inapposite evidentiary matter of "whether a representative sample may be used to establish classwide liability." *Id.* at 1049. So to the extent that Plaintiffs argue that *Tyson* applies to the instant case, the court rejects Plaintiffs' argument.

> Family Dollar Stores. . . . These allegations of high-level decision-making authority exercised by officials at corporate headquarters are thus different in kind from the allegations in *Wal-Mart*, in which local supervisors were vested with almost absolute discretion over pay and promotion decisions. Given these substantial distinctions, *Wal-Mart* does not preclude as a matter of law a class certification.

*Id.* at 117.

In contrast to each of the above cases—which contemplated company-wide, objective, and *de jure* policies implemented by high-level decisionmakers—Plaintiffs here allege something altogether different. As Plaintiffs describe the referral and selection process, the only scenario in which D&Z supervisors selected foremen was when the Union failed to do so—at which point D&Z's site manager or craft supervisor "may," in apparent *ad hoc* fashion, "step-up" someone to fill the missing role. (Doc. 30 at 7.) According to the Amended Complaint, the factors that informed these decisions included considering "leadership," "prior experience," and "absenteeism," as well as "reliance upon procedures and criteria which permit and encourage the incorporation of racial stereotypes and bias," "intentional racial bias or stereotypes in such defendants' decision making process," "pre-selection of whites," "nepotism," and "discouragement of applications and expressions of interest by African Americans through a reputation for racial bias, racially hostile conditions of work and unequal terms and conditions of employment." (Doc. 30 at 24–26.)

In short, Plaintiffs allege the same type of situation described in *Wal-Mart*, in which some managers "select [race]-neutral, performance-based criteria for hiring and promotion. . . . Others may choose to reward various attributes that produce disparate impact. . . . And still other managers may be guilty of intentional discrimination that produces a [race]-based disparity." *Wal-Mart*, 564 U.S. at 355–56. Within such an environment, neither disparate impact claims nor disparate treatment claims are certifiable. *Id. See also Washington v. Brown & Williamson*

23

*Tobacco Corp.*, 959 F.2d 1566, 1570 n.10 (11th Cir. 1992); *Bryant v. Southland Tube*, 294 F.R.D. 633, 644-45 (N.D. Ala. 2013) (explaining that, even as a general rule, disparate treatment claims are disfavored for class treatment because such "claims are by their very nature individual.")

Because Plaintiffs allege that D&Z supervisors engaged in a variety of discretionary, *ad hoc*, and subjective behaviors which provide "no cause to believe that all their claims can productively be litigated at once," the court finds that neither the disparate impact nor disparate treatment claims are suitable for class certification under Fed. R. Civ. P. 23(a)(2). *See Wal-Mart*, 564 at 350.

b.  *Fed. R. Civ. P. 23(b)*

Beyond meeting all four requirements of Rule 23(a)—which, as explained above, Plaintiffs have failed to accomplish here—a proposed class must also satisfy at least one of the alternative requirements of Rule 23(b). *See Jackson v. Motel 6 Multipurpose, Inc*., 130 F.3d 999, 1005 (11th Cir. 1997). In this case, Plaintiffs plead their claims pursuant to Rules 23(b)(2), which allows class certification for plaintiffs seeking declaratory or injunctive relief, and 23(b)(3), which permits class certification of plaintiffs seeking all types of relief, including damages. (Doc. 30 at 23.) *See also AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 (11th Cir. 2019) (describing 23(b)(2) as the "injunction class" rule and 23(b)(3) as the "damages class" rule); *Wal-Mart*, 564 U.S. at 362 (explaining that Rule 23(b)(3) is an "adventuresome innovation" that "allows class certification in a much wider set of circumstances" than Rule 23(b)(2)).

Rule 23(b)(2) permits class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) permits class certification when "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Eleventh Circuit explained that "Because these rules establish different threshold certification requirements and different procedural safeguards— protective of both defendants and absent class members—it is important that courts insist on the proper treatment of different types of classes. Injunction classes can go forward under Rule 23(b)(2); damages classes must satisfy Rule 23(b)(3)." *AA Suncoast*, 938 F.3d at 1174.

In this case, Plaintiffs do not seek to certify separate injunctive and damages classes. As explained above, Plaintiffs instead propose a single class while simultaneously seeking both injunctive/declaratory relief, such as "[a]n [o]rder restoring the named Plaintiffs and the class they seek to represent to the jobs they would now be occupying but for Defendants' discriminatory practices," as well as "back-pay (plus interest), punitive damages, and attorney's fees and costs and expenses." (Doc. 30 at 33.) Regardless, as explained below, Plaintiffs' putative class fails under either Rule.

### *Rule 23(b)(2)*

By the very terms of Plaintiffs' demanded remedies, Plaintiffs' proposed class is uncertifiable under Rule 23(b)(2). The Supreme Court explained that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant . . . [or] when each class member would be entitled to an individualized award of monetary damages." *Wal-*

*Mart*, 564 U.S. at 360–61. Simply put, individualized money claims, such as Plaintiffs' demand for backpay and punitive damages here, "should not be certified under Rule 23(b)(2) at all" because such "claims belong in Rule 23(b)(3)." *See id.* at 362, 365.

Plaintiffs cite to the pre-*Wal-Mart* case *Williams v. Mohawk Indus.*, 568 F.3d 1350, 1360 (11th Cir. 2009), for the proposition that the court should certify the class under a "hybrid" arrangement, which would allow certification of the proposed class's injunctive and declaratory claims under Rule 23(b)(2) and its damages claims under Rule 23(b)(3). (Doc. 30 at 23; Doc 41 at 38.) Two years before *Wal-Mart*, the Eleventh Circuit in *Williams* explained a possible hybrid approach as follows: "If the district court determines that common issues predominate and certifies a class for damages under subsection (b)(3), the district court must consider whether to certify a class under subsection (b)(2) with respect to the employees' claim for equitable relief." *Id.*

But as the Eleventh Circuit has since explained, "Before *Wal-Mart*, we allowed plaintiffs to seek monetary relief through a Rule 23(b)(2) injunction class if the monetary relief was incidental to injunctive relief—that is, if it would flow automatically to class members without complex individualized determinations. In *Wal-Mart*, the Supreme Court appeared to lower the gate on that pathway to certification but did not fully slam it shut." *AA Suncoast*, 938 F.3d at 1174 n.2 (internal quotations omitted).

In "lowering the gate," the Supreme Court in *Wal-Mart* stopped just shy of categorically preventing a district court from *ever* certifying a class under Rule 23(b)(2) when the plaintiffs seek *any* monetary damages, but the Court unequivocally determined that class demands for backpay claims are unsuitable for class certification under Rule 23(b)(2). *See Wal-Mart*, 564 U.S. at 360 ("[A]t a minimum, claims for *individualized* relief (like the backpay at issue here) do

26

not satisfy the Rule.") Plaintiffs' backpay demand, then, precludes certification under Rule 23(b)(2).

Lastly, Plaintiffs also argue that because their equitable claims predominate over their damages claims, the court should certify the class under Rule 23(b)(2). *See* Doc. 30 at 23 ("Injunctive, declaratory and equitable remedies are the predominant relief sought.") But the Supreme Court also extensively addressed, and rejected, this line of reasoning. *See Wal-Mart*, 564 U.S. at 363–365 (holding that such a "predominance" test violates plain meaning of Rule 23(b)(2), "does obvious violence to the Rule's structural features," creates perverse incentives for plaintiffs, and requires the trial court to "reevaluate the roster of class members continually" to determine who has standing.)

For all of these reasons, the court finds that Plaintiffs' alleged class, as pled, is not certifiable under Rule 23(b)(2).

### Rule 23(b)(3)

A court may certify a class under Rule 23(b)(3) if "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Eleventh Circuit breaks down this Rule into two distinct elements: (1) predominance and (2) superiority. *AA Suncoast*, 938 F.3d at 1175. In this case, D&Z argues, and the court agrees, that Plaintiffs' proposed class fails the predominance element. (*See* Doc. 35 at 28–29.)

The predominance analysis is similar the commonality analysis under Rule 23(a), but "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Evaluating predominance begins by identifying the

elements of the parties' claims and defenses. *Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1234 (11th Cir. 2016). "The district court should then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial. Common questions are ones where the same evidence will suffice for each member, and individual questions are ones where the evidence will vary from member to member." *Id.* Once the court identifies the common and individual questions, it then evaluates predominance—that is, the court pragmatically considers the relative importance of each type of question with the "overarching purpose" of "ensuring that a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Brown,* 817 F.3d at 1235 (quotation and ellipses omitted).

Plaintiffs primarily argue, citing to *Brown*, that Rule 23(b)(3) is satisfied because "individualized damages alone do not defeat predominance." (Doc. 41 at 30.) The Eleventh Circuit has indeed determined that "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Brown,* 817 F.3d at 1239. But the Circuit Court simultaneously held that "individual damages defeat predominance if computing them will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable. . . [or] when they are accompanied by significant individualized questions going to liability") (citation omitted).

In this case, the wide variety of requested damages, injunctions, and declarations, coupled with the intensely fact-specific nature of each Plaintiff's proposed remedies, clearly illustrates the predominance of individualized questions. (*See* Doc. 30 at 33–34) (requesting orders from the court "restoring the named Plaintiffs and the class they seek to represent to the jobs they

would now be occupying but for Defendants' discriminatory practices" and retroactively "adjust[ing] the wages and benefits" for each proposed class member). *See also AA Suncoast,* 938 F.3d at 1175 (a proposed class fails to satisfy Rule 23(b)(3) when each member must "jump through a series of hoops to establish an individualized entitlement to damages.")

Even a perfunctory glance at the elements of Plaintiffs' claims and alleged facts show that individualized questions predominate in this case. *See Brown,* 817 F.3d at 1234 (requiring the court to first consider whether the elements of the plaintiffs' claims tend toward generality or specificity and then predict how plaintiffs would prove the elements at trial). For Count I, disparate impact, Plaintiffs must prove three elements at trial: (1) "significant statistical disparity between the proportion of members of the protected class available in the labor pool and the proportion of members of the protected class hired [or promoted]"; (2) "a specific, facially neutral employment practice; and (3) a causal nexus exists between the employment practice and the statistical disparity." *Jefferson v. Burger King Corp.*, 505 F. App'x 830, 834 (11th Cir. 2013). But as the court explained in the Rule 23(a) analysis, *supra*, Plaintiffs have failed to demonstrate the existence of a facially neutral policy common to all proposed class members. And without such a policy, Plaintiffs can satisfy neither the second nor third element of a disparate impact claim.[2]

Similarly, Plaintiffs' Count II for disparate treatment requires Plaintiffs to prove "discriminatory intent either through direct or circumstantial evidence." *Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001). On the matter of evidence in this context, the

---

[2] As for the first element, significant statistical disparity, Plaintiffs allege that the "referral and selection rate for African Americans was less than 80% of the rate of non-African Americans." (Doc. 30 at 9.) Because the second and third elements of Plaintiffs' disparate impact claim are not met, the court makes no determination about the sufficiency of the first element.

Eleventh Circuit explained that "[i]f common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class should not have a substantial effect on the substance or quantity of evidence offered." *Brown*, 817 F.3d at 1235. But in this case, every new Plaintiff would necessarily require additional evidence regarding the context of each choice a Defendant's supervisor or manager made in selecting someone else for every position, thus requiring the court to consider the circumstances surrounding each of thousands of placement decisions made by an unstated but certainly high number of decisionmakers over the course of a decade.

The court finds D&Z's description of the situation apt:

> Plaintiffs claim they—and members of the classes—were denied leadership positions, supervisory positions, promotion opportunities, transfer opportunities, equal compensation, and equal terms and conditions of work. According to them, the reason for any one of these decisions may have been because the Union Defendants, the DZ Defendants, or some combination of the two, allegedly failed or refused to announce or post . . . employment opportunities, hiring assignments, job opportunities, leadership opportunities, transfer opportunities, training opportunities, or apprenticeship opportunities; engaged in nepotism; failed or refused to otherwise take steps to undo the continuing effects of past racial discrimination; or some combination thereof. So, for each Plaintiff and each member of each class, the Court would need to first identify the adverse employment action at issue, the reasons for it, defenses related to it, and whether, on the whole, it was or was not discrimination based on race.

(Doc. 35 at 28–29.) The court finds that because the evidence needed at trial—for both proving the element of discriminatory intent and in determining remedies—would vary significantly from Plaintiff to Plaintiff, individual questions also predominate for Plaintiffs' disparate treatment claim.

For all of these reasons, the court finds that Plaintiffs' proposed class fails to satisfy the predominance element of Federal Rule of Civil Procedure 23(b)(3) and is therefore uncertifiable.

**Conclusion**

Because Plaintiffs' Amended Complaint is an impermissible shotgun pleading and because Plaintiffs' class claims fail to satisfy Federal Rules of Civil Procedure 23(a) and 23(b), the court **WILL GRANT** D&Z's motion to dismiss (Doc. 35), and **WILL DISMISS** Plaintiffs' entire Amended Complaint, as to D&Z, **WITHOUT PREJUDICE**. The court also **WILL STRIKE** Plaintiffs' class claims. Plaintiffs' Amended Complaint remains operative as to the Union Defendants. The court will enter a separate order accompanying this memorandum opinion.

**DONE** and **ORDERED** this 15th day of July, 2020.

_Karon O. Bowdre_
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE