**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RONALD KING, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:19-CV-01115-KOB** |
| | ) | |
| **UA LOCAL 91, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION</u>**

As the ancient saying goes, "third time's the charm." This employment discrimination case returns to the court on a *third* round of motions to dismiss and motions to sever. (Docs. 99, 100, 101, 102, 103). Although the Plaintiffs' Third Amended Complaint is far from perfect, it contains enough factual allegations to present *plausible* causes of action against both Union Defendants for disparate impact and disparate treatment in the Unions' referral procedures. And because all of the Plaintiffs claims are logically related to each other and to all Defendants, the court will deny without prejudice D&Z and UA International's motions to sever. So, as the court will explain thoroughly below, it will deny *all* of the Defendants' pending motions.

### I. Procedural History

Before the court addresses the specifics of the Plaintiffs' Third Amended Complaint[1] and each Defendant's pending motion, let us review where this case stands. At this point, the court has already granted all three Defendants' motions to dismiss Plaintiffs' *class* claims against them (docs. 43 & 85); granted Defendant Day and Zimmermann NPS, Inc.'s (D&Z) *second* motion to dismiss the Plaintiffs' individual disparate impact and disparate treatment claims against it on

---

[1] The Third Amended Complaint is the operative Complaint for purposes of this Memorandum Opinion.

shotgun pleading grounds *with prejudice* (doc. 85); denied D&Z's motion to dismiss Plaintiffs Samuel and Jones' retaliation claims (doc. 85); and granted both the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada (UA International) and its local affiliate UA Local 91's motions to dismiss all Plaintiffs' individual disparate impact and disparate treatment claims *without prejudice* on shotgun pleading grounds (doc. 85).

After the second round of motions to dismiss, Plaintiffs Samuel and Jones's retaliation claims against D&Z survived, and the court gave all Plaintiffs another opportunity to replead their individual disparate impact and disparate treatment claims against both Union Defendants. The court specifically warned Plaintiffs:

> To avoid dismissal with prejudice on shotgun pleading grounds, the Plaintiffs' Third Amended Complaint—if the Plaintiffs file one—should include to the extent practicable (1) which Defendant(s) used which challenged employment practice(s); (2) which Defendant(s) used nepotism to place the listed individuals at ¶ 22 of the Second Amended Complaint into leadership positions; and (3) the relationship between the International Union and UA Local 91, including but not limited to any and all facts showing the existence of an agency relationship between the International and Local 91 and the role each Union Defendant played in referring Union members to leadership positions on D&Z jobs.

(Doc. 85 at 27).

The Plaintiffs filed a Third Amended Complaint addressing the court's concerns.  (Doc. 89).  Now, both Union Defendants have filed motions to dismiss the Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  (Docs. 99, 100, 103).  UA International, in the alternative, asks the court to sever the Plaintiffs' claims against it from each other and the other Defendants.  (Docs. 99 & 100).  And D&Z asks the court to sever Plaintiffs Samuel and Jones' retaliation claims from each other and from all Plaintiffs' claims against the other Defendants;

D&Z asks that these two retaliation claims "each be severed into a stand-alone action."  In the alternative, D&Z asks the court to strike the portions of the Third Amended Complaint that relate to Counts the court has already dismissed with prejudice.  (Doc. 101).

## II.   Factual Allegations in the Third Amended Complaint

The five individual Plaintiffs Ronald King, Anthony Robinson, Chris Samuel, Nolan Jones, Jr., and Brian Struggs bring disparate impact (Counts One and Three) and disparate treatment claims (Counts Two and Four) against both Union Defendants pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and pursuant to 29 U.S.C. § 1981 for the disparate treatment claims.  Plaintiffs Samuel and Jones also bring retaliation claims (Count Five) against Defendant D&Z under Title VII and § 1981.

All five Plaintiffs are African-American members of both UA International and UA Local 91, and all Plaintiffs obtained employment as Journeymen with D&Z and other contractors through UA Local 91 referrals. (Doc. 89 at 4). The crux of the Plaintiffs' Third Amended Complaint is that UA Local 91 through its referral policies and procedures denied the Plaintiffs the opportunity to work in leadership positions—including foreman, general foreman, and other leadership positions—at D&Z and other contractors at the same rate as Caucasian Union members (doc. 89 at 4); that UA International is liable for UA Local 91's referral practices and procedures because it negotiated a collective bargaining agreement on behalf of UA Local 91 that delegated to UA Local 91 the referral powers and failed to monitor, correct, or remedy racial discrimination caused by those referral powers (doc. 89 at 44-47); and that Defendant D&Z retaliated against Plaintiffs Samuel and Jones for filing the EEOC charges that alleged racial discrimination against D&Z and the Unions (doc. 89 at 59-62).

*The Collective Bargaining Agreement*

UA International negotiated and adopted the "Southern Company Maintenance and Modification Agreement" (SCMMA) on behalf of itself and UA Local 91.  (Doc. 89-1 at 2).  As a signatory on the SCMMA, UA International agreed to its involvement in the grievance procedure established by the SCMMA that addresses any disputes that arise regarding "interpretation or application of this Agreement," including the Union referral provisions in the SCMMA.  (Doc. 89-1 at 4-5).

The SCMMA includes a "Non-Discrimination & Workplace Harassment Policy," that states that the "Contractors and Unions will not tolerate any discrimination or harassment including physical or verbal acts that are offensive or show hostility or discrimination toward other individuals based on race, color . . . ." That non-discrimination policy in the SCMMA states that "[p]rohibited misconduct includes, but is not limited to, epithets, slurs, negative stereotyping, threats, intimidations, hostile acts, or written or graphic material representations intended to disparage another individual for any reason."  The policy also states that the contractors and Unions "will *work together* to insure [sic] that any violations of this code of behavior are met with the strictest means of rebuke and penalization allowed by employment law and by our Union constitutions."  (Doc. 89-1 at 17).

Under the SCMMA, the contractors recognize the Unions as a "source of employment referrals." The SCMMA provides that the Unions "shall refer all applicants for employment to this project according to the standards or criteria uniformly applied to any maintenance project in the area."  (Doc. 89-1 at 15).  Specifically, the SCMMA provides:

> After the foreman and steward have been designated, the Contractor shall have the right to select seven (7) craftsmen from among the top 90% of the currently available applicants registered on the Local Union's primary out-of-work list. The next five (5) craftsmen shall be *referred* from the current out-of-work list *in keeping with the referral rules*. The next two (2) craftsmen may be selected by

> the Contractor from the top 90% of the primary out-of- work list
> with the following five (5) craftsmen being dispatched from the
> current out- of-work list, and predicated upon job requirements, this
> ratio shall be maintained when hiring additional craftsmen.
> However, if the job will require ten or less craftsmen from the
> affected craft, the Contractor may call by name for no more than
> 50% of the actual number of craftsmen needed as key employees
> from the top 90% of the currently available applicants registered on
> the Local Union's primary out-of-work list.

(Doc. 89-1 at 13).  Under the SCMMA, a contractor may temporarily assign craftsmen until the Local Union complies with the request for referrals for craftsmen.  (Doc. 89 at 7).

Although the Unions refer craftsmen to contractors for jobs, the SCMMA provides that the contractors have complete authority to decide the numbers of employees required for a job; hire and lay off employees; transfer employees with special skills to another position at the same plant site; determine the need and number of foremen and name them; and "reject any applicant referred by the Union for a lawful or non-discriminatory reason."  The contractors also "may hire key employees by name who have special skills" or who have prior experience with the contractor.  (Doc. 89-1 at 13-14).

### UA Local Referral Process

When a contractor needs workers, it sends a "manpower request" to UA Local 91 by phone or email for a particular outage or project.  The number of workers the contractor requests depends on the scope of work for the job.  Upon receipt of the "manpower request," UA Local 91's Business Manager refers particular union members to the contractor by sending it a "referral list" typically by telefax or email.  (Doc. 89 at 8-9).

The referral list can include UA Local 91's referrals for foreman, general foreman, and other supervisory positions for the outage or project.  UA Local 91's referral process for these leadership positions relied on Union members "prior experience" and "prior leadership," and

Plaintiffs allege that UA Local 91 did not post or announce vacancies or opportunities for Plaintiffs to apply for leadership positions.  Plaintiffs personally observed, as part of their Union activities and meetings, their work on the plant floors with the contractors, and past Union referrals, that UA Local 91 based many referrals for leadership positions on nepotism.  (Doc. 89 at 9, 15-22).

If UA Local 91's referral list did not refer any Union members to consider for a leadership position,  the contractor could "step up" a member on the Union's referral list to fill that position.  "The referral and selection process for both leadership and journeymen positions occurred separately for each outage or project."  (Doc. 89 at 9-10).

*Qualification of Plaintiffs for Leadership Positions*

Plaintiffs have worked in their respective crafts as journeymen pipefitters or welders on various outages and projects with D&Z and other contractors in various states during the applicable limitations period in this case.  Based on Plaintiffs' active participation in UA Local 91 activities and affairs; their experience with and knowledge of UA Local 91's referral practices and decisions; their personal knowledge of the training, experience, knowledge, skills, and personal characteristics of Caucasians referred by the Union for leadership positions; and contractors' descriptions of duties for leadership positions, Plaintiffs assert they are qualified for leadership positions with contractors in their respective crafts.  Plaintiffs also allege they were interested in leadership positions.  (Doc. 89 at 10-14).

*Disparate Impact and Disparate Treatment Claims*

### UA Local 91

Plaintiffs state that UA Local 91's referral process for leadership positions with contractors had its "genesis in the racially segregated trades and trade union practices of an

earlier era." Plaintiffs claim that, despite their qualifications for a leadership position, UA Local 91 never referred them for foreman, general foreman, or any other leadership position because of its referral polices that denied them an opportunity to obtain any leadership positions because of their race. (Doc. 89 at 10-11).

Regarding the race of Union members referred by UA Local 91 to leadership positions, Plaintiffs allege that they personally observed the race of UA Local 91 members, the race of Union members referred for leadership positions, the race of Union members appointed by the contractors, and the race of Union members with whom they worked over the last ten years. Based on these personal observations, Plaintiffs claim that UA Local 91 "referred disproportionately few African American members" for leadership jobs "throughout the limitations period applicable in this case. The Plaintiffs allege that based on their observations and knowledge, "Local 91's referrals for foreman and general foreman were substantially disproportionate to the number of African Americans who were eligible for such referrals and appointments" and that its referral of African American's for leadership positions were "less than 80% of the referral rate of non-African Americans." And the Plaintiffs list the names of 36 Caucasians whom the Plaintiffs allege UA Local 91 referred allegedly for "all such [leadership] opportunities." (Doc. 89 at 10-11, 15-16).

The Plaintiffs allege that, based on their personal knowledge and observation, UA Local 91 had no African American members with prior experience or leadership as foreman, general foreman, or any other leadership positions over "substantial periods of time over the last ten years or more. So, Plaintiffs assert that UA Local's 91's race-neutral practice of using prior experience and prior leadership as criteria for leadership positions resulted in UA Local 91 referring Caucasians who did have prior leadership experience for "virtually all" leadership

positions, "thereby freezing the status quo and perpetuating past racial discrimination." (Doc. 89 at 15).

Plaintiffs also allege that, based on their personal experience and knowledge, UA Local 91's failure to post or receive applications for leadership positions meant that they could only learn of leadership positions through informal "word-of-mouth" from other Union members. Because most Union members were Caucasian, they and other African American members had "less opportunity to learn about and compete for such vacancies and opportunities than their Caucasian peers." And the Plaintiffs state that UA Local 91's practice of nepotism perpetuated this racial disproportion and adversely affected them because the Union had mostly Caucasian members whose relatives benefitted from the nepotism. (Doc. 89 at 18, 20-21).

The Plaintiffs also assert that UA Local 91 maintained a racially hostile union environment by "prominently displaying the racially abusive symbolism of the Confederate Flag as an official part of its meetings and meeting hall"; purchasing the flag with Union funds; imposing this symbolism of the flag as part of their Union "environment"; and "fostering and allowing members' racially abusive slurs and threats to flourish with impunity." (Doc. 89 at 22).

### UA International

The Plaintiffs seek to hold UA International liable based on its negotiation of the SCMMA on behalf of UA Local 91. The Plaintiffs allege that, through the SCMMA, UA International specifically delegated to UA Local 91 the referral rights that allows UA Local 91 to utilize its referral procedures and practices. The Plaintiffs also allege that UA International is vicariously liable because UA Local 91 "participates in referrals as the agent of the International Union."

The Plaintiffs allege that UA Local 91's authority to refer its members to contractors stems from powers that UA International delegated to it pursuant to the SCMMA entered on behalf of UA Local 91.  The Plaintiffs assert that UA International "maintains control over all aspects of the SCMMA," including the "referral policies and practices"; the grievance procedure in the SCMMA; "representation on the State Labor Management Cooperation Committee (LMCC) responsible for 'develop[ing] policies and procedures for operation'"; and the non-discrimination provision in the SCMMA "mandating equal employment opportunities without regard to race."  (Doc. 89 at 23-26). The Plaintiffs allege that the International Union has the "contractual power and responsibility under the SCMMA to affirmatively monitor, correct, and remedy Local 91's exercise of the referral rights" to ensure it is not inconsistent with the non-discrimination clause in the SCMMA, but UA International failed to do so.

The Plaintiffs also allege that UA International officials and representative knew that UA Local 91 displayed the Confederate Flag at the head of its Union Hall and during Union meetings because they were "routinely in and around Local 91's Union Hall and business operations." The Plaintiffs state that UA International knew about these actions also because they served it with EEOC charges in 2018 and 2019, which put it on actual notice of "such racial hostility and other racial discrimination."  (Doc. 89 at 28).

### Retaliation Claims

Plaintiffs Chris Samuel and Nolan Jones, Jr. allege that D&Z retaliated against them for filing EEOC charges related to this case.  According to Plaintiff Samuel, D&Z fired him as *foreman* on a jobsite "in retaliation for the EEOC Charge he filed against the racially discriminatory practices challenged in this case."  According to Plaintiff Samuel's retaliation claim, "the General Foreman had always selected the Foremen under them," but a D&Z

supervisor intervened to remove Plaintiff Samuel as foreman after he filed EEOC charges in an exception to this customary practice. (Doc. 89 at 29-30).  And Plaintiff Jones claims that D&Z "suspended and/or terminated" him after filing EEOC charges related to this case. (Doc. 89 at 31).

### III.    Motions to Dismiss

#### A.  Legal Standard

Both Union Defendants bring their motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), which attacks the legal sufficiency of the complaint.  When reviewing a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept as true all factual allegations in the complaint. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court, however, disregards "conclusory allegations" and "naked assertions devoid of further factual enhancement." *McCullough*, 907 F.3d at 1333; *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)) (internal quotation marks omitted). In other words, the court does not honor "unadorned, the-defendant-unlawfully-harmed-me accusations" with the presumption of truth. *McCullough*, 907 F.3d at 1324 (quoting *Iqbal*, 556 U.S. at 678). Such impermissible assertions include mere "labels and conclusions and formulaic recitations of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).

After disregarding all assertions not entitled to a presumption of truth, the court examines the remaining factual allegations to ensure that they "plausibly give rise to an entitlement to relief." *McCullough*, 907 F.3d at 1324 (quoting *Iqbal*, 556 U.S. at 679) (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In short, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Motions to dismiss operate to root out claims with no legal basis. *White v. Bank of Am. Nat. Ass'n*, 599 F. App'x 379, 381 (11th Cir. 2015) (quoting *Cty. of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 818 (7th Cir. 2006)).

The court may consider documents attached to the complaint and incorporated by reference in the complaint on a motion to dismiss. *Financial Sec. Assur., Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). Because the Plaintiffs attached the SCMMA to the Third Amended Complaint, the court will consider it in deciding the motion to dismiss. *See* (Doc. 89-1).

### B. Analysis

#### 1. UA Local 91's Motion to Dismiss

UA Local 91 argues that the Plaintiffs fail to state a claim upon which relief can be granted because the SCMMA "unequivocally states that employers have the right and obligation to *select* foremen, not Local 91" and because the disparate impact and disparate treatment claims are based on "conclusory allegations, speculation, and non-specific facts which fail to inform Local of the conduct which is alleged to be wrongful." (Doc. 103-1 at 7) (emphasis added). Both of these grounds fail because the Plaintiffs state a plausible claim for both disparate impact and disparate treatment regarding UA Local 91's *referral* practices and procedures.

#### *Referral v. Selection*

The SCMMA does give the contractors the right to *select* foreman. *See* (Doc. 89-1 at 13-14). But as the Plaintiffs argue in their response, UA Local 91 confuses the *referral* stage with the *selection* stage. *See* (Doc. 114 at 10). The Plaintiffs' basis for race discrimination under

disparate impact and disparate treatment involves UA Local 91's *referral* process and practices that allegedly deprived them of the *opportunity* for a leadership position.

Title VII specifically instructs that unions shall not "classify or fail or *refuse to refer* for employment any individual in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's race [or] color." 42 U.S.C. § 2000e-2(c) (emphasis added). The fact that the SCMMA vests the ultimate decision with the contractors whether to hire or appoint a referred Union member to a leadership position does not negate that UA Local 91 plausibly could be liable for discrimination in its referral process for leadership positions.

UA Local 91 also argues that Plaintiff Samuel's retaliation claim shows that "foremen are *chosen* by employers and not the Local." (Doc. 103-1 at 9). That retaliation claim alleges that Plaintiff Samuel's general foreman *selected* him as foreman; that "general foreman had always previously *selected* the Foreman under them . . . "; and that at least six general foremen "had been allowed to *choose* his own foreman." (Doc. 89 at 29-31) (emphasis added). UA Local 91 claims that, "[i]n other words, the foremen were not referred or nominated by the Union [but] were chosen by the employees of the employer exactly as provided for by the SCMMA." (Doc. 103-1 at 9).

But, although the allegations in the retaliation claim may muddy the waters regarding the *selection* of Union members for leadership positions, Plaintiff Samuel's allegations in his retaliation claim do not foreclose the Plaintiffs' plausible claim that UA Local 91 *referred* Union members for leadership positions in a discriminatory manner.

The Plaintiffs allege that UA Local 91, under its referral procedures, *could* include Local 91's nominees for foreman, general foreman, and other supervisory positions on jobs for which it

referred Union members.  But, Plaintiffs also admit that, if UA Local 91 did not include

leadership nominations in its referral of Union members for a particular job, the contractor could

"step up members *from the union's referral list*" for that particular job.  (Doc. 89 at 9).  Nothing

in Plaintiff Samuel's retaliation claim or the SCMMA forecloses that the contractor, through its

General Foreman, could select the Foreman *from UA Local 91's referral list* when UA Local 91

did not specifically nominate a Union member for a leadership position.  UA Local 91 plausibly

could have referred Plaintiff Samuels for that particular job, did not nominate anyone for a

leadership position for that particular referral, and the contractor allowed its General Foreman to

choose the Foreman from the UA Local 91's referral list for that job.  So, the court finds that

Plaintiff Samuel's alleged facts in his retaliation claim do not necessarily contradict the

Plaintiffs' allegations regarding UA Local 91's alleged discriminatory *referral* practices for

leadership positions.

And, although the Complaint is not completely clear on this issue, the fact that the

contractor, through its General Foreman, could choose the Foreman from UA Local 91's referral

list when UA Local 91 did not nominate anyone for a leadership position does not mean that UA

Local 91 never referred *any* Union members for leadership positions.  From the allegations in the

Plaintiffs' Complaint, the court could reasonably infer that UA Local 91 *referred* the Plaintiffs

for particular jobs with various contractors over the past ten years; that it nominated or *referred*

Caucasian Union members for leadership positions for at least some of those referrals; and that

UA Local 91 never nominated or *referred* any of the Plaintiffs for a leadership position for any

job for which it referred the Plaintiffs for work.  Based on the Plaintiffs' allegations, an inference

that UA Local 91 never referred Caucasian Union members for a leadership position for any of

the jobs for which it referred the plaintiffs to work would be unreasonable.

The court finds that the fact that the contractor ultimately *selects* the Union members for leadership positions for a job does not affect that the Plaintiffs have alleged a plausible claim for disparate treatment and disparate impact in UA Local 91's *referrals* for those leadership positions.

### Conclusory and Speculative Facts

UA Local 91 also asserts that the Plaintiffs do not have "standing" to bring a disparate impact claim because their conclusory allegations are insufficient to show an adverse impact on them. It also argues that the allegations in the Complaint are "conclusory and speculative and do not provide notice to the Local of the facts upon which the claims rest." UA Local 91 claims that, although the Plaintiffs alleged the referral polices and consequences of those policies "at length," they "never alleged any actual instances of adverse action by the Local in the referral process." As such, UA Local 91 argues that the Plaintiffs fail to allege the "who, what, where, or when of any specific adverse action" and, thus, fail to meet the pleading standard for both the disparate impact and disparate treatment claims. (Doc. 103-1 at 10-17). The court disagrees and will explain why.

### Disparate Impact under Title VII

UA Local 91 argues that the Plaintiffs do not have standing to assert a disparate impact claim because their conclusory allegation that UA Local 91's referral policy has a disparate impact on them is not enough to meet their pleading burden. True, the Plaintiffs must do more than merely state conclusions. But UA Local 91 agrees that, at the motion to dismiss stage, the Plaintiffs do not have to *prove* a prima facia case of disparate impact, and that Plaintiffs must only provide a short and plain statement of the claim with enough facts to identify the factual basis of the claim. *See* (Doc. 103-1 at 11) (citing *Davis v. Coca Cola Bottling Co. Consol.*, 516

F.3d 955, 974 (11th Cir. 2008).  The Plaintiffs have met this *pleading* burden for a disparate impact claim and have standing to bring it.

Although the Plaintiffs do not have to *prove* at the pleading stage the prima facie elements for a disparate impact claim, an understanding of those elements aids the court in determining whether the Plaintiffs have alleged enough facts to state a *plausible* claim of disparate impact based on those prima facie elements.  "Disparate impact theory prohibits neutral employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group."  *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000).  So, to prevail on a disparate impact claim involving Union referrals, the Plaintiffs would have to show that UA Local 91's "facially neutral [referral] practice has a significantly discriminatory impact" on African American UA Local 91 members. *See Connecticut v. Teal*, 457 U.S. 440, 446 (1982) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)).

Specifically, the Plaintiffs would have to show: (1) a "significant statistical [racial] disparity"; (2) a "specific, facially[] neutral, employment practice which is the alleged cause of the disparity"; and (3) a "causal connection exists between the specific employment practice identified and the statistical disparity shown."  *Joe's Stone Crab*, 220 F.3d at 1274.  The Plaintiffs have alleged enough facts to support a plausible disparate impact claim regarding each of these elements.

UA Local 91 admits that the Plaintiffs identify three separate race-neutral referral practices in the Complaint: "prior experience/leadership requirements, nepotism, and no posting of vacancies/opportunities."  (Doc. 103-1 at 16-17).  But UA Local 91 asserts that the Plaintiffs "do not allege how each practice individually impacted them" and do not allege enough facts to

"plausibly infer that the challenged practices have had a statistically significant 'disparate impact.'"  (Doc. 103-1 at 16-17).  The court disagrees.

Plaintiffs allege that UA Local 91's race-neutral polices had a disparate impact on them individually as African Americans because those policies resulted in UA Local 91 never referring any of them for any leadership position for any jobs for which UA Local 91 referred them.  Plaintiffs claim that UA Local 91 has a history of racially segregated trades and trade practices.  (Doc. 89 at 12).  They also allege, based on their personal observation and knowledge, that UA Local 91 had no African American members with prior experience as foreman, general foreman, or other leadership positions over "substantial periods of time over the last ten years or more"; but Caucasians had prior experience in these leadership positions.  Plaintiffs allege that they and other African American Union members had no prior experience in a leadership position because of UA Local 91's past history of racially segregated trades and trade practices, which resulted in UA Local 91 not referring them for any leadership positions.

The court reasonably infers that UA Local 91's alleged past history of racially segregated trades and trade practices denied African Americans the opportunity to gain leadership experience.  And the Plaintiffs allege that UA Local 91's race neutral practice of using prior experience and prior leadership as criteria for leadership positions resulted in UA Local 91 referring Caucasians for "virtually all" leadership positions, "thereby freezing the status quo and perpetuating past racial discrimination."  (Doc. 89 at 15-17). Under these alleged facts, requiring prior leadership experience could have a disparate impact on the Plaintiffs.  *See Walker v. Jefferson County Home*, 726 F.2d 1554, 1558 (11th Cir. 1984) ("[B]lacks were first denied the opportunity to obtain supervisory experience, and then were told they were 'unqualified' for promotion because they lacked the very quality that had intentionally been denied to them. Thus,

the requirement of supervisory experience served to freeze the status quo of prior discriminatory employment practices.")

Regarding UA Local 91's lack of posting of leadership positions and use of "word-of-mouth" as a means of communicating leadership positions, the Plaintiffs allege that, because most Union members are Caucasian, the Plaintiffs and other African American members had "less opportunity to learn about and compete for such vacancies and opportunities than their Caucasian peers." (Doc. 89 at 15). Word-of-mouth recruiting can create a "built-in headwind" that isolates African Americans from the "web of information" related to job opening. *United States v. Georgia Power Co.*, 474 F.2d 906, 925 (5th Cir. 1973).

And the Plaintiffs specifically allege that UA Local 91's practice of nepotism perpetuated this racial disproportion because the Union had mostly Caucasian members whose relatives benefitted from the nepotism, which affected the Plaintiffs' opportunity for referral for a leadership position. (Doc. 89 at 15, 18). Although nepotism alone is not a violation of Title VII, nepotism is "prohibited when it results in discrimination." *E.E.O.C. v. H.S. Campt & Sons, Inc.*, 542 F. Supp. 411, 423 n. 5 (M.D. Fla. 1982). These specific allegations show how each of these facially neutral referral practices adversely affected the Plaintiffs as African American Union members.

Contrary to UA Local 91's assertions, the Plaintiffs do not have to plead each and every specific job and date on which UA Local 91 referred a Caucasian union member for a leadership position and not them because of these policies. Federal Rule of Civil Procedure 8 does not require *detailed* facts to give reasonable notice to the defendant of the plaintiff's claim against it. The Plaintiffs allege that they have been journeymen pipefitters or welders on various outages and projects for more than ten years; have worked as journeymen in their respective crafts with

17

D&Z and other contractors in various states; and were qualified for a leadership position. And according to the Plaintiffs, UA Local 91 never referred any of them for any leadership position on any job over those ten years because of its referral practices. In fact, the only African American Union members named in the Complaint who held leadership positions with D&Z did not receive those positions until 2019, notably *after* the Plaintiffs filed their EEOC complaints that form the basis for this racial discrimination lawsuit.

UA Local 91 argues that the Plaintiffs did not allege that they were on the out-of-work list for any specific jobs for which UA Local 91 referred a Caucasian Union member for a leadership position—but not in a leadership position. But the court infers that the Plaintiffs were on the out-of-work list at least for all of the jobs for which UA Local 91 in fact referred the Plaintiffs and for which the Plaintiffs actually worked. The court reasonably infers that UA Local 91 applied its race-neutral referral practices for each of the Plaintiff's jobs with D&Z and other contractors for which UA Local 91 referred the Plaintiffs to work; UA Local 91 referred Union members for leadership positions for at least some of the jobs for which UA Local 91 referred the Plaintiffs, rather than the contractor stepping up someone from the referral list; UA Local 91 did not refer any of the Plaintiffs for a leadership position for any of those jobs to which it referred Plaintiffs for work; and UA Local 91 referred Caucasian Union members for all such leadership positions prior to the Plaintiffs' EEOC complaints.

Requiring the Plaintiffs at the pleading stage to allege the specific jobs and dates of each of those jobs for which UA Local 91 in fact referred a Caucasian Union member for a leadership position but did not refer the Plaintiffs for a leadership position; to show how each of the race-neutral policies specifically prevented them from obtaining each specific job, and to specifically list the Caucasian Union member referred for those specific jobs instead of the Plaintiffs goes

well beyond Rule 8's *notice* pleading requirements.  And UA Local 91 should have records of each of those jobs on which the Plaintiffs worked over those ten years and its leadership referrals for each of those jobs; so, discovery should reveal those specific details.  When all the specific information regarding specific jobs, dates, and Union members referred for leadership positions is in UA Local 91's possession, the Plaintiffs are not in a position at the pleading stage to submit detailed information that only discovery would reveal.  *See Mims v. TVA Bd. of Dirs.*, 5:13-cv-672-CLS, 2014 U.S. Dist. Lexis 99073 *10 (N.D. Ala. July 22, 2014) ("[D]espite the pleading requirements discussed in the *Twombly* and *Iqbal* decisions, a plaintiff asserting a disparate impact claim should not be required to plead facts that are in the exclusive control of the employer.")

UA Local 91 also argues that the Plaintiffs' disparate impact claim should fail because they do not allege statistics that show that UA Local 91's race-neutral referral practices created a significant racial disparity between African American and Caucasian Union members referred for leadership positions for each specific job.  Specifically, UA Local 91 argues that the Complaint "fails to allege the number of African Americans available for a specific referral that resulted in a referred worker being selected as the foreman for the project."  It claims that "without knowing the representation of a group in a selection/candidate pool, there is no way of establishing that a challenged practice had a disproportionate impact on such group."  (Doc. 103-1 at 17-18).

But nothing in Title VII or Fed. R. Civ. P. 8 requires that the Plaintiffs allege statistical data at the *pleading* stage for a disparate impact claim.  Although the court can find no binding Eleventh Circuit case directly addressing whether a plaintiff must present statistical evidence at the pleading stage in a disparate impact case, several district courts within the Eleventh Circuit

have held that statistical evidence is not required to survive a motion to dismiss. *See Hall v. Dolgencorp*, 2:20-cv-12-LSC, 2020 WL 7388649 (N.D. Ala. December 16, 2020) ("It is unreasonable and contrary to pleading standards to expect Hall to be able to allege statistical data in her complaint concerning the impact of Dollar General's policy on pregnant women. It is sufficient that Hall alleged that a facially neutral policy has a disproportionate impact on a protected class, which she has done."); *Pritchard v. Fla. High Sch. Athletic Ass'n Inc.*, No. 2:19-cv-94-GTM-29MRM, 2019 WL 1993511, at *5 (M.D. Fla. May 6, 2019) (stating that statistical evidence is "necessary to prevail on a disparate impact claim but not required to survive a motion to dismiss at the pleading stage").

Here, the Plaintiffs do more than state mere conclusions about the disparate impact UA Local 91's referral polices have on them as African Americans. The Plaintiffs allege that, based on their *personal observation and knowledge* of the race of all of UA Local 91 members, the race of Union members referred for leadership positions, the race of Union members selected by the contractors, and the race of Union members with whom they worked over the last ten years, "Local 91's referrals for foreman and general foreman were substantially disproportionate to the number of African Americans who were eligible for such referrals and appointments" and that its referral of African American's for leadership positions were "less than 80% of the referral rate of non-African Americans." These factual allegations at the *pleading* stage are enough to plausibly show a significant racial disparity in UA Local 91's referral practices.

The court finds that the Plaintiffs have standing to bring their disparate impact claim and have alleged enough facts for a plausible disparate impact claim based on UA Local 91's referral procedures. So, the court will DENY UA Local 91's motion to dismiss Plaintiffs' disparate impact claims.

*Disparate Treatment under Title VII and § 1981*

The essence of the Plaintiffs' disparate treatment claim is that UA Local 91 through its referral process denied them the opportunity to work in leadership positions—including foreman, general foreman, and other leadership positions— at D&Z and other contractors at the same rate as white Union members.  (Doc. 89 at 4).  UA Local 91 argues that the Plaintiffs' allegations regarding disparate treatment in the Complaint are "conclusory and speculative and do not provide notice to the Local of the facts upon which the claims rest."  This court disagrees.

As set out in the legal standard section, the court fully understands the Plaintiff's pleading requirements at this stage of the proceedings.  To survive a motion to dismiss, the Plaintiffs must allege enough facts for the court to draw the reasonable inference "that the defendant is *liable* for the misconduct alleged." *See  Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556) (emphasis added).  So, to evaluate whether the Plaintiffs have alleged enough facts at this stage for the court to infer UA Local 91's liability for the alleged disparate treatment based on race, the court must consider what the Plaintiff ultimately would have to prove either at the summary judgment stage or at trial.

The court first notes that race discrimination claims brought under § 1981 utilize the same standard of proof and same analytical framework as claims under Title VII; so, the court can address those claims together.  *See Crawford v. Carroll*, 529 F.3d 961, 970 (11 th Cir. 2008) (noting that the standards governing Title VII discrimination cases apply to Section 1981 discrimination claims).  Where, as here, the Plaintiffs do not allege any direct evidence of discrimination, they can ultimately prove disparate treatment by circumstantial evidence applying the burden-shifting *McDonnell Douglas* framework: the Plaintiffs first must establish a prima facie case; if so, the burden then shifts to the defendant to proffer a legitimate,

nondiscriminatory reason for its action; if the defendant carries its burden, the burden shifts back to the Plaintiffs to show that the proffered reason is a pretext for a discriminatory motive.  *See Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (setting out the burden-shifting framework from *McDonnell Douglas*).  But again, the Plaintiffs do not have to *prove* the prima facie elements of disparate treatment to survive a motion to dismiss; they need only allege enough facts to show a *plausible* claim.

The requirements for a prima facie case in a § 1981 or Title VII disparate treatment case are normally based on the four elements listed in *McDonnel Douglas*: (1) the plaintiffs belong to a racial minority; (2) they applied and were qualified for jobs for which the employer was seeking applicants; (3) that despite their qualifications, they were rejected; and (4) that after their rejection the employer continued to seek applicants.  411 U.S. 792 (1973).  But *McDonnell Douglas* was an employment *hiring* case, so "variants of the four factors will apply" when the facts involve a Union referral.  *See Barber v. International Broth. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers, Dist. Lodge No. 57*, 778 F.2d 750 , 756 (11th Cir. 1985) (in a case involving referrals at *unequal wage rates*, the prime facie requirements were that the plaintiff was a member of a racial minority, was "properly on the union's out-of-work list," and was "not referred at the same wage rate as were white trainees").

In the context of the facts of this particular case involving Union referrals for leadership positions, the Plaintiffs assert that the elements for a prima facie case for disparate treatment include that the Plaintiffs are African American members of UA Local 91 who were subject to Local 91's referral powers under the SCMMA; were qualified for referrals to foreman and other leadership positions; were interested in referrals for leadership positions and made their interest known to UA Local 91 as best they could despite no posting or applications for leadership

positions; and UA Local 91 did not select the Plaintiffs for referrals it made to contractors for leadership positions but referred Caucasian members instead.  (Doc. 114 at 14-15).

But UA Local 91 argues that the Plaintiffs will need to show that a contractor requested that UA Local 91 refer workers for a project; that UA Local 91 referred the Plaintiffs to a project; that a foreman position was available on the project at the time of the referral; and that the Plaintiffs were "not selected for a foreman position."  (Doc. 103-1 at 11).

The court takes issue with UA Local 91's purported elements for a prima facie case for disparate treatment within the context of the facts of this case.  First, those elements do not consider that the alleged discrimination involves UA Local 91's *referrals* for a *leadership position*. The question is not whether the contractor ultimately *selected* the Plaintiffs for foreman position; but whether UA Local 91 failed to *refer* the Plaintiffs for a leadership position because of their race.  And UA Local 91's purported elements also do not require that the Plaintiffs show that UA Local 91 referred Caucasians for leadership positions and not the Plaintiffs.

And the Plaintiffs' purported elements seem to ignore that UA Local 91's referrals of Union members for leadership positions occurred only when contractors requested referrals for Union members to work on a job. According to the Plaintiffs' allegations, UA Local 91 could include on the list of Union members referred to work on a particular job the names of "nominees for foreman, general foremen and other supervisory positions."  And when UA Local 91 did not include such nominees for leadership positions on those referral lists, the contractor could step up a name from that referral list.  So, the Plaintiffs would have to show that on the jobs for which UA Local 91 referred them to work, UA Local 91 also referred a Caucasian Union member for a leadership position instead of them.

So, based on the facts of this particular case, the court finds that a combination of both the Plaintiffs and UA Local 91's purported elements makes more sense.  Ultimately, the Plaintiffs will need to prove that they are African American members of UA Local 91 who were subject to Local 91's referral powers under the SCMMA; they were qualified for referrals to foreman and other leadership positions; they were interested in referrals for leadership positions and made their interest known to UA Local 91 as best they could despite no posting or applications for leadership positions; UA Local 91 referred the Plaintiffs for jobs for which it also referred Union members for a leadership position; and UA Local 91 did not select Plaintiffs for referrals it made to contractors for leadership positions but referred Caucasian members instead.  *See Wrobbel v. International Broth. Of Elec. Workers*, 638 F. Supp 2d 780, 789 (E.D. Mich. 2009) (finding that, to establish a prima facie case based on a union's failure to refer, the plaintiff must show that she is a member of a protected class; was qualified for a job referral; was not referred despite her qualifications; and a person outside of her protected class with similar qualifications was referred).

The Plaintiffs have alleged specifically, or the court can reasonably infer from the factual allegations in the Complaint, a *plausible* claim for disparate treatment based on all of these elements.  And as the court previously explained under the disparate impact analysis, the Plaintiffs do not have to spell out in the Complaint each and every job for which UA Local 91 referred them and specifically name the Caucasian Union member referred instead of them, especially when UA Local 91 should have all of that information in its records.

The court can reasonably infer from the alleged facts that UA Local 91 referred Caucasians for leadership positions on at least some of the jobs for which UA Local 91 referred them to work, even though the Plaintiffs do not name each and every one of those jobs or the

specific Caucasian selected for a leadership position on a particular job instead of them.  So, based on all of the facts alleged in the Complaint and reasonably inferred by the court, the Plaintiffs have pled a plausible prima facie case for disparate treatment.

Ultimately, at either the summary judgment stage or trial, if they prove their prima facie case and UA Local 91 meets its burden to show a non-discriminatory reason for its actions, the Plaintiffs will have to prove that UA Local 91's proffered reason was a pretext for intentional discrimination.  *See Joe's Stone Crabs*, 296 F.3d at 1272.  To that end, the Plaintiffs also allege in their Complaint that UA Local 91 maintained a racially hostile union environment by "prominently displaying the racially abusive symbolism of the Confederate Flag as an official part of its meetings and meeting hall"; purchasing the flag with Union funds; imposing this symbolism of the flag as part of their Union "environment"; and "fostering and allowing members' racially abusive slurs and threats to flourish with impunity."  (Doc. 89 at 22).

The court can reasonably infer that UA Local 91's display of the Confederate Flag at a part of the Union meetings could show racial hostility or bias against African Americans.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) (reversing the district court's grant of summary judgment for the employer and finding that, in the context of a hostile working environment, "'it is not an irrational inference that one who displays the confederate flag may harbor racial bias against African-Americans'") (quoting *United States v. Blanding*, 250 F.3d 858, 861 (4th Cir. 2001)).  The Court in *Blanding* further stated that "[i]t is the sincerely held view of many Americans, of all races, that the [C]onfederate flag is a symbol of racial separation and oppression."  So, the Plaintiffs' alleged facts involving the display of the Confederate flag and environment of racially abusive slurs at UA Local 91 also support the Plaintiffs' claims for disparate treatment based on their race.

25

The court acknowledges that the Plaintiffs' alleged facts in the Complaint and the court's reasonable inferences from those facts ultimately may not withstand discovery and a motion for summary judgment on the disparate impact and disparate treatment claims. *See Watts v. Ford Motor Co.*, 519 F. App'x 584, 587 (11th Cir. 2013) (The Plaintiff alleged enough facts to state a plausible claim for relief. "Whether that claim will withstand discovery and a motion for summary judgment remains to be seen."). But at this point, the court must deem as true the alleged facts and draw all reasonable inferences from them. And based on those alleged facts and reasonable inferences, the court finds that the Plaintiffs have alleged enough facts to show they have standing to bring and have alleged a plausible claim for discrimination based on disparate impact and disparate treatment. So, the court will DENY UA Local 91's motion to dismiss Plaintiffs' disparate impact and disparate treatment claims.

## 2.   UA International's Motion to Dismiss

UA International asks the court to dismiss the Plaintiffs' disparate impact and treatment claims for failure to state a plausible claim because it was not involved in UA Local's referral procedures; had no affirmative duty to supervise or police UA Local 91's referral procedures; is not vicariously liable for the actions of UA Local 91; and lacks a sufficient connection with the alleged discriminatory practices of UA Local 91. (Doc. 100). But, at this stage, the court focuses not on what UA International could ultimately show in defense; the court's focus is on what the Plaintiffs have alleged in the Complaint against UA International and reasonable inferences from those factual allegations. As the court will explain below, the Plaintiffs have alleged enough facts to show a plausible claim against UA International for both disparate impact and disparate treatment based on UA Local 91's referral procedures.

26

International Labor Unions "must bear a heavy responsibility in giving effect to the remedial provisions of Title VII." *Sinyard v. Foote & Davies Div. of McCall Corp.*, 577 F.2d 943, 945 (5th Cir. 1978).[2] So, an international union "may incur liability for discriminatory *effects* of contract provisions found in collective bargaining agreements." *Sinyard*, 577 F.2d at 945 (emphasis added). UA International can be liable for a discriminatory practice if it has a "sufficient connection" with the discriminatory practice. *See Sinyard*, 577 F.2d at 945 (citing *Myers v. Gilman Paper Corp.,* 544 F.2d 837, 851 (5th Cir.), *cert. dismissed,* 434 U.S. 801 (1977)).

Whether a "significant connection" exists between the international union and the discriminatory practice depends in part on "the relationship between the international and the local and the amount and type of involvement which the international has with the collective bargaining agreement." *Sinyard*, 577 F.2d at 945. The "significant connection" standard for international union liability is not "meaningfully different form common-law agency principles." A*lexander v. Local 496, Laborers' Inter. Union of North America*, 177 F.3d 394, 409 n.3 (6th Cir. 1999). Applying traditional common law agency principles, an international union can be liable for the action of its local union if it "instigated, supported, ratified, or encouraged" the local union's discriminatory practices. *Alexander*, 177 F.3d at 409.

And an international union's liability "depends on the circumstances of each case." *Id.* Where the international union approves or negotiates a discriminatory provision contained in the collective bargaining agreement, the international union becomes "'jointly responsible with the local [union].'" *Id.* at 945-46 (quoting *Patterson v. Am. Tobacco Co.*, 535 F.2d 257, 271 (4th Cir. 1976)) (in which the Fourth Circuit held that a sufficient connection existed where the

---

[2] Cases decided by the Fifth Circuit before 1981 are binding precedent in the Eleventh Circuit. *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981).

international union provided an advisor to the local in its negotiations and the international approved the resultant collective bargaining agreement). And, where an agency relationship exists, international unions have "an affirmative duty to oppose the local's discriminatory conduct." *Alexander*, 177 F.3d at 409 (citing *Sinyard*, 577 F.2d at 945).

UA International argues that it did not negotiate into the SCMMA UA Local 91's referral policies involving prior experience, prior leadership, and failure to post or announce leadership positions. UA International claims that those policies are "not mentioned anywhere" in the SCMMA and that the Plaintiffs allege no facts that UA International "knew about Local 91's alleged policies or their alleged impact on the Plaintiffs at the time that UA negotiated the SMCCA." (Doc. 100 at 11).

But the Plaintiffs argue that UA International is liable for the race discrimination alleged in this case because, when it negotiated the SCMMA on behalf of itself and UA Local 91, UA International specifically agreed that UA Local 91 would refer workers to contractors under the SCMMA and negotiated UA Local 91's referral rights. The Plaintiffs also argue that the International Union agreed in the SCMMA that UA Local 91 "shall refer all applicants for employment . . . according to the *standards or criteria* uniformly applied to any maintenance project *in the area*." (Doc. 89-1 at 15). And the Plaintiffs argue that UA International by signing the SCMMA on behalf of itself and UA Local 91 agreed that referrals would be made "in keeping with the referral rules." (Doc. 89-1 at 13).

Based on its reading of these provisions in the SCMMA, the "standards or criteria" language quoted above *could* mean the "standards or criteria" on which Local Unions base its referrals. Although the SCMMA does not specifically identify whose "referral rules," the court reasonably infers from the surrounding sentences that "in keeping with the referral rules" *could*

mean "in keeping with the [Local Union's] referral rules." From these provisions in the SCMMA, the court could reasonably infer that UA International in essence agreed that UA Local 91would apply and follow its referral policies and procedures in existence at the time UA International negotiated the SCMMA.  Also, UA International negotiated UA Local 91's referral rights under the SCMMA and reasonably knew UA Local 91 would use its referral procedures and policies in existence at that time to make those referrals to contractors.

And the court agrees with the Plaintiffs that the court can reasonably infer that, by agreeing in the SCMMA to UA Local 91's use of its referral rules and procedures, UA International had knowledge of UA Local 91's referral procedures at the time UA International negotiated the SCMMA in 2017.  Logically, UA International would not have negotiated referral rights for UA Local 91 under the SCMMA and agreed that UA Local 91 would use referral rules or procedures of which UA International had no knowledge to effectuate those negotiated referrals.

And the court reasonably infers from the alleged facts in the Complaint that UA Local 91 utilized those referral procedures for many years before UA International negotiated the SCMMA on behalf of UA Local 91.  Moreover, the Plaintiffs allege that UA Local 91's referral procedures, which the UA International agreed to in the SCMMA, had its "genesis in the racially segregated trades and trade union practices of an earlier era."  (Doc. 89 at 11).

The Plaintiffs also assert in the Complaint that the relationship between UA International and UA Local 91 included Local 91 officers and members serving as representatives or officials of UA International for various purposes.  And the Plaintiffs also allege that UA International maintained control over UA Local 91's referrals through UA International's agreement in the

SCMMA to "work together" to ensure UA Local 91 did not apply those referral rights in a discriminatory manner.

The Plaintiffs also allege that UA International's "officials and representatives were also routinely in and around Local 91's Union Hall and business operations." (Doc. 89 at 28). If UA International's officials and representatives routinely were part of or even observed UA Local 91's business operations, the court can reasonably infer that they had some knowledge about how UA Local 91 referred workers for jobs and leadership positions. And the court could also reasonably infer that those UA International officers and representative who were around UA Local 91's business operations would have seen the Confederate flag displayed as part of its Union business and witnessed the racially-hostile environment alleged by the Plaintiffs.

The court finds that all these factual allegations against UA International in the Complaint at least plausibly show a significant connection between the UA International and UA Local 91's discriminatory referral practices. The Plaintiffs have plausibly alleged that UA International, by negotiating and delegating referral rights to UA Local 91 and agreeing that UA Local 91 would use its referral policies and procedures to effectuate those referral rights, supported or encouraged UA Local 91's use of the referral policies that had an alleged discriminatory impact on the Plaintiffs. Further, UA International's routine presence in and around UA Local 91's union hall and business practices, including the display of the Confederate flag and UA Local 91's alleged environment of racial hostility, support a reasonable inference that UA International had as significant connect with UA Local 91's alleged discriminatory practices.

As the court noted previously, the Plaintiffs' allegations regarding UA International's relationship with UA Local 91 may not withstand discovery and summary judgment. But at this

motion to dismiss stage and under Rule 8's notice standard, the court finds that the Plaintiffs have alleged enough facts to raise a *plausible* claim against UA International for disparate impact and disparate treatment. So, the court will DENY UA International's motion to dismiss Plaintiffs' disparate impact and disparate treatment claims.

## IV.        Motions to Sever

D&Z requests that Plaintiffs Samuel and Jones' retaliation claims "each be severed into a stand-alone action" pursuant to Federal Rule of Civil Procedure 21.  (Doc. 102 at 11).  And UA International asks the court, in the alternative, to sever all five Plaintiffs' claims against it from each other pursuant to Federal Rules of Civil Procedure 20(a)(1) and 21.  For the following reasons, the court will deny both motions to sever without prejudice at this juncture.

Under Fed. R. Civ. P. 21, "the court may at any time, on just terms, add or drop a party [or] sever any claim against a party." District courts possess "considerable discretion" in determining whether to sever a case and may consider "administrative reasons" in deciding whether to order severance. *Estate of Amergi ex rel. Amergi v. Palestinian Auth.*, 611 F.3d 1350, 1367 (11th Cir. 2010).

Joinder of parties and claims is "strongly encouraged," and the court should construe joinder rules "generously 'toward entertaining the broadest possible scope of action consistent with fairness to the parties.'"  *Vanover v. NCO Fin. Serv., Inc.*, 857 F.3d 833, 839 (11 Cir. 2017) (quoting *United Mine Workers of Am. V. Gibbs*, 383 U.S. 715, 724 (1966)).  Joinder is proper under Fed. R. Civ. P. 20(a) if the plaintiffs have "(a) a right to relief arising out of the same transaction or occurrence, or series of transactions or occurrences, and (2) some questions of law or fact common to all persons seeking to be joined." *Alexander v. Fulton County*, 207 F.3d

1303, 1323 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304

(11th Cir. 2003).

A transaction "may comprehend a series of many occurrences, depending not so much

upon the immediateness of their connection as upon their logical relationship." *Alexander,* 207

F.3d at 1323.  "[A]ll 'logically related' events entitling a person to institute a legal action against

another generally are regarded as comprising a transaction or occurrence.' " *Id.* (quoting *Mosley*

*v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974)). And not *all* questions of law and

fact raised by the dispute must be common, but only *some* question of law or fact be common to

all parties for joinder to be appropriate. *Id.* (citing *Mosley*, 497 F.2d at 1334).

All five Plaintiffs challenge UA Local 91's referral practices and procedures and UA

International's role in that process under disparate impact and disparate treatment theories.

Allegedly, UA Local 91's Business Manager made the referral decisions regarding all five

Plaintiffs.  And Plaintiffs Samuel and Jones's retaliation claims against D&Z arise from the

EEOC charges and events that all five Plaintiffs allege in their disparate impact and treatment

claims against the Union Defendants. So, the court finds that all of the Plaintiffs claims against

all Defendants have a logical relationship to each other and some common questions of law and

fact.

And, neither D&Z nor UA International have shown that at this stage in the litigation

they would be unduly prejudiced by these matters proceeding as one case.  The court finds that

joinder of all of the Plaintiffs claims against all Defendants at this stage in the proceedings "best

serves judicial economy and efficiency."  *See Davis v. Dept. of Corr.*, 2:20-cv-327-WKW, 2021

WL 1343054 *2 (M.D. Ala. April 9, 2021).

But, if after discovery and dispositive motions, the evidence shows that the court should sever some parties or claims for trial, the Defendants could request separate trials pursuant to Fed. R. Civ. P. 42(b).

So, the court DENIES WITHOUT PREJUDICE both D&Z's and UA International's motions to sever at this juncture.

### V. Motion to Strike

D&Z also argues in the alternative that the court should strike portions of the Third Amended Complaint that relate to Counts that the court previously dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(f), the court's inherent power, or both.  Rule 12(f) permits a court, on its own or pursuant to a motion, to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  The court will DENY this motion.

The Plaintiffs did *not* include in the Third Amended Complaint any Counts the court had previously dismissed. And no matter the wording in the Plaintiffs' prayer for relief in the Complaint, no confusion exists that, if the Plaintiffs were to prevail on any of their claims against any Defendants, the Plaintiffs would be entitled only to relief that the law allows.

So, the court sees no need to strike any portions of the Plaintiffs' Third Amended Complaint and will DENY D&Z's motion to strike.

### VI.   Conclusion

For the reasons explained above, the court will DENY both Union Defendants' motions to dismiss (docs. 99, 100, 103); DENY WITHOUT PREJUDICE UA International's motion to sever (docs. 99, 100); DENY WITHOUT PREJUDICE D&Z's motion to sever (docs. 101, 102); and DENY D&Z's motion to strike (docs. 101, 102).

The court will enter a separate Order regarding its actions on these motions.

**DONE** and **ORDERED** this 15th day of March, 2022.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE