FILED

2024 Oct-07  AM 10:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **RONALD KING, et al.,** ] | |
| ] | |
| **Plaintiffs,** ] | |
| ] | |
| **v.** ] | **Case No.: 2:19-cv-1115-ACA** |
| ] | |
| **UA LOCAL 91, et al.,** ] | |
| ] | |
| **Defendants.** ] | |

## <u>MEMORANDUM OPINION</u>

UA is an international labor organization that charters local unions, including Local 91.[1] Local 91 operates a hiring hall from which it makes employment referrals to contractors who are parties to an agreement between it, a defined group of contractors, and Southern Company. Broadly, the agreement works like this: when a contractor needs workers for a Southern Company job, the contractor asks Local 91 to recommend union members. Local 91 makes its recommendations based off a list of members who are looking for work and submits those names on a referral sheet.

---

[1] Over the course of this case, the parties have referred to themselves with different abbreviations. The court will refer to Defendant Local 91, United Association of Plumbers, Steamfitters, Welders & HVAC Technicians as "Local 91" and Defendant International Union, the United Association of Journeymen & Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada as "UA." The court will use "Defendants" to refer to both defendants collectively.

The plaintiffs here are five black Local 91 members who contend Local 91 discriminated against them based on their race by failing to list them as foreman[2] on referral sheets despite their qualifications. These plaintiffs, Ronald King, Anthony Robinson, Chris Samuel, Nolan Jones, Jr., and Brian Struggs (collectively "Plaintiffs") filed this lawsuit against Local 91, UA, and a contractor. As relevant here, the operative complaint is the third amended complaint (which, for ease of reference, the court will simply call "the complaint"), which alleges the following claims:

1) disparate impact discrimination in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 against Local 91 ("Count 1") and UA ("Count 3");

2) disparate treatment discrimination, in violation of Title VII and 42 U.S.C. § 1981, as follows:

   a. failure to refer against Local 91 ("Count 2(a)") and UA ("Count 4(a)"), and

   b. hostile work environment against Local 91 ("Count 2(b)") and UA ("Count 2(b)").

(Doc. 89 ¶¶ 70–148).

Defendants move for summary judgment on all claims. (Docs. 272, 274). Plaintiffs failed to create a triable issue on whether the practices they complained of disparately impacted them because of their race, so the court **WILL GRANT** Local

---

[2] The parties use the term "foreman" to include different supervisory positions. The court adopts this practice here.

91's and UA's motions for summary judgment on Counts 1 and 3, respectively. Plaintiffs also failed to create a triable issue about whether Local 91 or UA made referrals based on race or imposed a hostile work environment, so the court **WILL GRANT** Local 91's and UA's motions for summary judgment on Counts 2 and 4, respectively. Accordingly, the court **WILL ENTER SUMMARY JUDGMENT** in Local 91's and UA's favor on all claims.

## I.    BACKGROUND

When ruling on a motion for summary judgment, the court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve[s] all reasonable doubts about the facts in favor of the non-movant." *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022) (quotation marks omitted). Where the parties have presented evidence creating a dispute of fact, the court's description of the facts adopts the version most favorable to the non-movant. *See id.*; *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not even be what a jury at trial would, or will, determine to be the facts.").

### 1.   Factual Background

UA is an international labor organization that charters local unions. (Doc. 277-1 at 1 ¶¶ 2–3). One of those chartered unions is Local 91, a central Alabama union

3

representing pipefitters, welders, plumbers, and apprentices. (Doc. 290-14 at 2 ¶ 2). Local 91 operates a hiring hall from which it makes employment recommendations[3] to contractors who have entered into an agreement with the union for its members to work on their jobsites. (*See id.* at 3 ¶ 2; doc. 89 at 7 ¶ 16).

One of the labor agreements to which Local 91 was a member was the Southern Company Maintenance and Modification Agreement ("SCMMA"). (Doc. 290-14 at 3 ¶¶ 2, 4). The SCMMA recognizes Local 91 and other local unions as a source of employment referrals. Under the SCMMA, contractors submit referral requests to Local 91 for job applicants to complete various projects at power generation plants owned by Southern Company. (*Id.* at 3 ¶ 4). These referral requests are made on a project-by-project basis. Referral requests can be for workers, for a foreman, or for workers and a foreman.

When Local 91 receives a referral request, it compiles a referral sheet identifying the members referred for the job. (Doc. 290-14 at 3; *see also* doc. 277-6 at 65; doc. 275-4 at 3 ¶ 4). There are two ways a union member can be listed on the referral sheet. First, if the contractor specifically identifies a Local 91 member (also

---

[3] The parties use the term "refer" to describe two separate situations. In one situation, a contractor asks for Local 91 to recommend union members for employment, Local 91 selects union members from a list of members currently looking for work, and Local 91 "refers" those members to the contractor. (*See* doc. 286-9 at 63; doc. 277-6 at 85). In the other situation, a contractor asks Local 91 for specific union members and Local 91 "refers" those members to the contractor. To avoid confusion, the court will use the word "recommend" when Local 91 selects the members to be placed on the referral sheet.

known as "calling by name"), Local 91 must place that member on the referral sheet. (Doc. 275-3 at 14 § 1(f); doc. 286-9 at 10, 62; doc. 275-5 at 3 § 4). If the contractor calls a member by name for the foreman position, Local 91 must place that member in the foreman position on the referral sheet. (Doc. 286-9 at 62). Second, if the contractor asks for recommendations without specifically identifying members, Local 91 selects union members off the "Out of Work List," a list Local 91 maintains of members who are currently available for jobs. (Doc. 275-4 at 3 § 4). Local 91 creates a separate version of this list for each trade (*e.g.*, pipefitters, welders, plumbers), and members are listed in order of time and date of their registration. (Docs. 275-4 at 2–3; 290-14 at 3 ¶ 5; 7–8; *see also* doc. 309 at 7). To be on the Out of Work List, a member cannot be employed in the trade in Local 91's jurisdiction, but members may be on multiple lists at one time. (Doc. 275-4 at 3; doc. 286-9 at 13).

When a contractor asks Local 91 for recommendations, Local 91 selects members from the Out of Work List, starting with those who have been on the List longest. (Doc. 275-4 at 3 § 4; *see also* doc. 286-9 at 16, 61–62; doc. 292-17 at 7; doc. 300-1 at 13). Local 91 confirms with each member that the member wants to be referred for the job. (*See* doc. 277-6 at 95–96). A member can turn down the referral for any reason. (*See* doc. 300-1 at 11, 13). If the member accepts the recommendation, Local 91 places the member on the referral list. If the contractor

did not call a member by name for a foreman position, Local 91 recommends the member who has been on the list longest for that position. (Doc. 277-6 at 96; doc. 286-9 at 17).

Once Local 91 completes the referral sheet, it sends the sheet to the contractor. (*See* doc. 292-17 at 9; *e.g.*, doc. 290-16). The sheet characterizes the members as being "referred" regardless of whether the contractor called them by name or Local 91 recommended them. (*See* doc. 286-9 at 31, 50–52). If the contractor called a referred member by name, the contractor will hire that member, but a member recommended by Local 91 is not guaranteed employment simply because the member's name is on the referral sheet. (Doc. 277-6 at 85; Doc. 275-3 at 14 ¶ 1(f); *see also* doc. 286-9 at 62).

Plaintiffs contend that they were interested in, and qualified for, foreman referrals but Local 91 selected white members who had been on the list for less time over them. They allege that Local 91's referral process included policies and procedures that had the effect of denying them the opportunity to be placed on the referral list. (Doc. 89 at 9 ¶ 22, 32–35 ¶¶ 70–79, 35-40 ¶¶ 80–99).[4] Plaintiffs maintain that the policies and procedures Local 91's used as part of its referral process

---

[4] As drafted, Plaintiffs' complaint also alleged that Local 91 discriminated against Plaintiffs by choosing not to refer any members for foreman positions. (Doc. 89 at 9 ¶22). Prior to the case being reassigned to the undersigned, the court dismissed this claim upon motion for judgment on the pleadings after finding that the complaint failed to plead any facts to plausibly support Plaintiffs' allegation that the practice existed. (*See* doc. 220).

disparately impacted them and were used as pretext to hide intentional discrimination. (*Id.*)

For their claims against UA, Plaintiffs claims that UA knew about and is responsible for the policies and procedures Local 91 used in its referral process as well as its creation and fostering of a racially hostile environment and that it failed or refused to exercise its power and responsibility to take steps to stop these practices, thereby allowing Plaintiffs to be disparately impacted by them. (Doc. 89 at 43–52 at ¶¶ 101–119). Plaintiffs further allege that Local 91's use of certain policies and procedures and its racially hostile environment are evidence of disparate treatment by Local 91, which Plaintiffs maintain UA knew about and had a responsibility to end but failed and/or refused to exercise its power to end this discrimination. (*Id.* at 52– 58 ¶¶120–136).

2.  Procedural History

Plaintiffs filed this case in July 2019 (doc. 1) and it was reassigned to the undersigned in November 2023 with a series of pending motions, including three motions for summary judgment (doc. 313). Before reassignment, the parties engaged in substantial motion practice regarding the nature and scope of Plaintiffs' claims. (Docs. 34, 36, 59, 60, 62, 99, 100, 103, 151, 181, 211). The previous judge addressed these issues in several opinions and orders. (*See* docs. 121, 187, 220, 234). Relevant here, the previous judge found that Plaintiffs adequately pleaded a disparate

treatment claim against both Local 91 and International Union "*only* regarding situations where Local 91 referred a [white] member for a leadership position on a [SCMMA] job for which it also referred one or more of the Plaintiffs to be part of the crew." (Doc. 220 at 10–11, 20; *see, e.g.*, doc. 121 at 24; doc. 234 at 5). The judge also held that Plaintiffs had *not* pleaded a disparate treatment claim against Defendants for referrals where Plaintiffs were on the Out of Work List but were not referred to the crew at all. (*See* doc. 234 at 4–5).

## II.   DISCUSSION

The court analyzes the Title VII and § 1981 claims together because they require the same proof and analytical framework. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023).

Plaintiffs assert claims of disparate impact discrimination and disparate discrimination against Local 91 and UA. (Doc. 89 ¶¶ 70–148). Title VII prohibits an employer from discriminating in the workplace based on an individual's race. 42 U.S.C. § 2000e-2(a); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc). There are two categories of discrimination: disparate impact and disparate treatment. *Reeves*, 594 F.3d at 807. Disparate impact involves a neutral employment practice that has a significant adverse effect on a protected group; a plaintiff typically proves his case though statistical disparities, rather than specific incidents. *Id.* Disparate treatment involves intentional discrimination which

take two forms: (1) an adverse tangible employment action, such as firing or demotion; or (2) a hostile work environment that "changes the terms and conditions of employment, even though the employee" suffers no tangible employment action. *See id.* (quotation marks omitted); *see also Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008). The court will first address the disparate impact claims followed by the disparate treatment claims.

1.  Counts 1 and 3: Disparate Impact under Title VII/§ 1981

"[D]isparate impact theory prohibits neutral employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group." *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000) (emphasis omitted). To prove a claim of disparate impact, a plaintiff must make a *prima facie* case by demonstrating that the defendant "uses a *particular* neutral employment practice that causes a disparate impact on the basis of race." 42 U.S.C. § 2000e–2(k)(1)(A)(i) (emphasis added); *see Joe's Stone Crab, Inc.*, 220 F.3d at 1274. "[T]he plaintiff must offer statistical evidence of a kind and degree sufficient to show that *the practice in question* has *caused* the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Joe's Stone Crab, Inc.*, 220 F.3d at 1274–75 (quotation marks omitted). Simply pointing to evidence of a statistical imbalance is not enough; a plaintiff "must causally connect a facially-neutral employment practice to the identified disparity." *Id.* at

1276; *accord* § 2000e-2(k)(1)(B)(i). There is one exception to the requirement, however: if a plaintiff "can demonstrate to the court that the elements of [defendant's] decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i).

Once the plaintiff has established a *prima facie* case, the burden "shifts to the defendant to establish that the challenged employment practice serves a legitimate, non-discriminatory business objective." *Id.* at 1275. Even if the defendant meets that burden, "a plaintiff may still prevail by proving that an alternative, non-discriminatory practice would have served the defendant's stated objective equally as well." *Id.*

In the complaint, Plaintiffs allege numerous practices they contend caused a significant disparity between the number of black and white members referred for foreman positions, including the consideration of experience and nepotism when making referrals, failing to announce and post foreman positions, and racial hostility. (*See* doc. 89 ¶¶ 33–46, 70–79, 101–19). For present purposes, the court assumes that Plaintiffs established a significant statistical disparity. Local 91 and UA both move for summary judgment on the ground that Plaintiffs have failed to present evidence that any of these practices caused the disparity. (*See* doc. 273 at 42; doc. 277 at 40).

Plaintiffs' response does not address Defendants' arguments, choosing instead to emphasize the disparity and defend its experts' methodology in examining the disparity related to the Local 91's members overall job experience. (Doc. 309 at 44-46). But disparity alone is not enough; Plaintiffs must also show that Local 91 had a policy or practice that caused the disparity in the numbers of black and white members referred as foreman. *See Joe's Stone Crab, Inc.*, 220 F.3d at 1274 (setting out the elements of a *prima facie* case of disparate impact discrimination and noting that "most critically," the plaintiff must establish "that a causal nexus exists between the specific employment practice identified and the statistical disparity shown"). Plaintiffs' failure to establish a particular practice caused the disparity prevents them from establishing their disparate impact claim. Accordingly, the court **WILL GRANT** Local 91 and UA's motions for summary judgment on the disparate impact claims. (Docs. 272, 274).

2.  Counts 2(a) and 4(a): Disparate Treatment (Tangible Employment Action) under Title VII/§ 1981

Plaintiffs make disparate treatment claims against Local 91 and UA under both Title VII and § 1981: Count 2 against Local 91 and Count 4 against UA. Plaintiffs assert, in the same count, that each defendant discriminated against them by taking tangible employment actions and by inflicting a hostile work environment. (*See* doc. 89 ¶¶ 82, 88, 126, 133–34). Although Plaintiffs are not required to plead each theory as a separate claim, for the sake of clarity the court will discuss the

tangible employment action theory against Local 91 and UA as Counts 2(a) and 4(a), respectively; and the hostile work environment theory against Local 91 and UA as Counts 2(b) and 4(b), respectively. *See Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1246 (11th Cir. 2004) ("[Plaintiff] was not required to plead tangible employment action as a separate claim, because it is not a separate claim.").

"Title VII of the Civil Rights Act of 1964 outlaws employment discrimination because of 'race, color, religion, sex, or national origin.'" *Tynes v. Fla. Dep't of Juv. Just.,* 88 F.4th 939, 943 (11th Cir. 2023) (citing 42 U.S.C. § 2000e-2(a)(1)). Likewise, § 1981 prohibits employers from intentionally discriminating on the basis of race in employment contracts. *Id*. at 944. *How* a plaintiff proves his claim under Title or § 1981 does not matter; a plaintiff can use direct evidence, circumstantial evidence, or both. *Id.* But *what* a plaintiff proves is critical; to prevail on a claim brought under either statute the plaintiff must establish that the employer made its decision because of a protected characteristic.

"Direct evidence" is "evidence, which if believed, proves existence of [the] fact in issue without inference or presumption." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (quotation marks omitted). Plaintiffs have not presented any direct evidence of discrimination in this case, relying instead on circumstantial and statistical evidence. As the court explained above, Plaintiffs' statistical evidence is insufficient because they have not provided any evidence of a

causal link between any of Defendants' practices or policies and the disparity. *Cf.*

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088–89 (11th Cir. 2004), *abrogated*

*in other part by Lewis*, 918 F.3d 1213 (11th Cir. 2019) (en banc) ("The statistical

evidence presented by [the plaintiff] does not have any probative value in

establishing a prima facie case of disparate treatment" where the plaintiff asserted

"an individual claim of disparate treatment regarding the denial of a promotion").

The remaining type of evidence, and the type of evidence on which Plaintiffs

rely here, is circumstantial. A plaintiff using circumstantial evidence may prevail by

"present[ing] a convincing mosaic of circumstantial evidence that would allow a jury

to infer intentional discrimination by the decisionmaker," *Jenkins v. Nell*, 26 F.4th

1243, 1250 (11th Cir. 2002), or by satisfying the evidentiary standard set out in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell*

*Douglas* test, the plaintiff must first establish a *prima facie* case of discrimination

by showing that he is a member of a minority, "that he was properly on the union's

out-of-work list," and that the defendant recommended a similarly situated white

member instead of the plaintiff. *Barber v. Int'l Bhd. of Boilermakers, Iron Ship*

*Builders, Blacksmiths, Forgers & Helpers, Dist. Lodge No. 57*, 778 F.2d 750, 756

(11th Cir. 1985); *see also McDonnell Douglas Corp.*, 411 U.S. at 802; *Lewis*, 918

F.3d at 1218.

13

The predecessor to this court restricted discovery on Plaintiffs' disparate treatment claim to instances in which Local 91's referral sheet listed one or more of the plaintiffs as a member of the crew and listed a white member as foreman. (Doc. 121 at 24; doc. 220 at 10–11; doc. 234 at 4–5 & n.2). Defendants contend that Plaintiffs cannot present any evidence that, within the relevant time period, Defendants made any referrals recommending a white member over one of the plaintiffs as foreman, so they cannot make out a *prima facie* case of discrimination for purposes of *McDonnell Douglas*. (Doc. 273 at 24–31). The court agrees.

The undisputed evidence shows that during the relevant time period, Local 91 recommended Mr. Robinson for eight jobs, but it was not asked to recommend a foreman for any of those jobs. (Doc. 290-15 at 4 ¶ 13; *see* doc. 273 at 11 ¶ 30; doc. 309 at 7). Local 91 recommended Mr. Struggs for only one job during the relevant period, and it recommended him as the foreman for that job. (Doc. 273 ¶¶ 47–53). Local 91 recommended Mr. Jones for fifteen jobs, of which only one referral request asked for Local 91 to recommend a foreman, and Local 91 recommended a black member other than Mr. Jones for the foreman position. (*Id.* ¶ 55). Local 91 recommended Mr. King for seven jobs, of which only one referral request asked for Local 91 to recommend a foreman, and the foreman recommendation was for a different trade than the Out of Work List from which Mr. King was selected. (*Id.* ¶¶ 61-65). Based on this evidence, Messrs. Robinson, Struggs, Jones, and King

cannot make out a *prima facie* case of disparate treatment under the *McDonnell Douglas* test.

This leaves Mr. Samuels. Local 91 recommended Mr. Samuels for two jobs, and Local 91 also recommended a foreman for both jobs. (Doc. 273 ¶ 71). The first recommendation was in January 2016, when Local 91 recommended Mr. Samuels for a crew position and a white member for foreman. (*Id.* ¶ 73). But Mr. Samuels concedes that any claim of disparate treatment in a tangible employment action based on that recommendation is barred by the statute of limitations, so the court can consider that recommendation only in relation to Mr. Samuels's claim of a hostile work environment. (Doc. 309 at 29–30). The second recommendation occurred in January 2019, when Local 91 recommended Mr. Samuels as foreman. (Doc. 273 ¶ 72). Mr. Samuels also cannot make out a *prima facie* case of disparate treatment under the *McDonnell Douglas* test.

But Plaintiffs' inability to satisfy the *McDonnell Douglas* test does not end this court's analysis. "A plaintiff who cannot satisfy the *McDonnell Douglass* framework may still be able to prove her case with a convincing mosaic of circumstantial evidence that would allow a reasonable jury to infer or find intentional racial discrimination in an adverse employment action." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1336–37 (11th Cir. 2024). A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) "suspicious timing,

ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019).

Defendants contend that there is insufficient evidence to establish a convincing mosaic that would allow a jury to infer intentional discrimination by the decisionmaker. (Doc. 273 at 31–35). In their complaint, Plaintiffs claimed that the many policies and procedures allegedly employed by Local 91 when making recommendations, coupled with a racially hostile environment and specific instances of disparate treatment, created a convincing mosaic of Local 91's discriminatory intent. Having found no evidence supporting the existence or consideration of the alleged policies and procedures used to make referrals, Plaintiffs now rely only on the existence of the Confederate flag at the hiring hall and specific referrals Plaintiffs contend establish that Local 91 violated its own rules. (Doc. 309 at 34–37). Defendants correctly identify Plaintiffs' evidence of instances of disparate treatment fall outside the scope of the claim as identified by the previous judge. They point to evidence that three of the plaintiffs have not heard any union officer make offensive racial comments since 2015 and the other two cannot recall such comments. (*Id.* at 32). The only other evidence proffered by Plaintiffs that occurred in a place over

which Local 91 had control was the existence of the Confederate flag at the hiring hall.

Title VII and § 1981 do not create a "civility code." *Reeves*, 594 F.3d at 807. And flying a controversial flag at the hiring hall cannot be considered a mosaic of evidence of discrimination. Plaintiffs have not provided evidence sufficient to create a triable fact connecting the existence of the flag to the decision maker's intent when making recommendations to contractors. There is no evidence that either of the two decision makers responsible for recommendations placed the flag on the hiring hall wall, encouraged that it be kept on the wall, or had the authority to take the flag down.

Defendants also argue that there is no evidence that Local 91 treated Plaintiffs differently than white members. (Doc. 273 at 34). In response, Plaintiffs present what they say is evidence of Local 91 referring white members for foreman positions where Plaintiffs were not referred to the crew in the first place. This attempt fails because it outside the framework of the claim as ordered by the previous judge years ago.

Because the court finds no Plaintiff has created a triable issue of fact that Local 91's referral practices were discriminatory, the court **WILL GRANT** Local 91's and UA's motions for summary judgment on the Plaintiffs' disparate treatment claim. (Docs. 272, 274).

**3.** Counts 2(b) and 4(b): Disparate Treatment (Hostile Union Environment) under Title VII/§ 1981

Plaintiffs also proceed under a hostile work environment theory of liability against each defendant. (*See* doc. 89 ¶¶ 77, 126). They allege Local 91 created and maintained a hostile environment (1) by prominently displaying a Confederate flag in the meeting hall and "as an official part of its meetings," (2) fostering and allowing union members' "racially abusive slurs and threats to flourish with impunity," (3) spending union funds "on such racially hostile symbols and flags," and (4) denying Plaintiffs "opportunit[ies] to be referred and/or appointed to leadership . . . positions because of these practices and their race." (*Id.* ¶¶ 45–46; *see id.* ¶ 77). And they allege UA knew of the hostile environment and failed or refused to address it. (*Id* ¶¶ 59–60, 77, 133). Both Defendants move for summary judgment on those claims. (*See* doc. 273 at 35–41; doc. 277 at 35–39).

Before the court addresses the merits of each defendants' arguments, it will address two issues that are common to Defendants' motions for summary judgment. First is whether Plaintiffs are asserting a hostile environment theory for Local 91's work environment *or* a hostile work environment theory for the worksites to which Plaintiffs were referred. It is clear from the complaint's allegations and Plaintiffs' arguments opposing summary judgments that their claim is limited only to Local 91's environment; they are not asserting a hostile work environment theory against either defendant for the environment at any of the worksites to which Plaintiffs were

referred. (*See* doc. 89 ¶¶ 45–46 (allegations exclusively relating to Local 91's conduct); doc. 309 at 42 (opposing summary judgment by arguing Local 91's brief "cites and relies only on cases addressing whether a union has an 'affirmative duty' to investigate other persons' hostile *workplace* environment (employers' or members'), not the union's liability for its own racially hostile *union* environment.")).

Second is whether Title VII provides a union member a cause of action against his union for a hostile work environment. Plaintiffs argue it does (*see* doc. 309 at 40–43; doc. 310 at 45), and Defendants argue it does not (*see* doc. 273 at 35; doc. 277 at 36). The Eleventh Circuit has not decided the issue.

For purposes of summary judgment, the court will assume without deciding that a union member can bring a claim against a union under a hostile work environment theory of liability. To establish such a claim, each plaintiff "must prove that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Adams v. Austal, USA, LLC*, 754 F.3d 1240, 1248 (11th Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Because each plaintiff's claim is based on his race, he must prove five elements:

> (1) he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his

race; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability.

*Adams*, 754 F.3d at 1248–49. "The fourth element requires a plaintiff to prove that the work environment is both subjectively and objectively hostile." *Id.* at 1249. To show an environment is subjectively hostile, each plaintiff must have subjectively perceived the harassment as sufficiently severe or pervasive to alter the conditions of his employment. *Id.* And to show an environment is objectively hostile, each plaintiff must show a reasonable person in his position, considering all the circumstances, would find the environment hostile or abusive. *Id.* A court considers four factors to evaluate if an environment is objectively hostile: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Adams*, 754 F.3d at 1250–51.

The court will address each defendant's motion for summary judgment in turn.

### a.  Count 2(b) – Local 91 (Hostile Work Environment)

Local 91 moves for summary judgment on this claim on the ground that no Plaintiff has presented evidence that the harassment was sufficiently severe or

pervasive: specifically, (1) no plaintiff testified to hearing any abusive comments from Local 91 officers since 2013, and none of those comments are actionable; and (2) seeing the Confederate flag is not, by itself, enough to create a triable issue of fact. (*See* doc. 273 at 40–41). Plaintiffs respond that the display of the Confederate flag in the hiring hall demonstrates Local 91's hostility toward Plaintiffs and makes their lives and careers "unnecessarily difficult and upsetting because of race." (*See* doc. 309 at 41–42) (quotation marks omitted). And they argue that the hostile environment "demean[s] and devalu[es]" black members' employment opportunities in the union, which they argue is shown by their expert's statistical data demonstrating contractors' preference for white foremen. (*See id.* at 42).

The only evidence Plaintiffs cite in the argument section of their brief is their declarations. (*See id.* at 41). The portions of the declarations they cite are nearly identical; each plaintiff alleges the Confederate flag was kept next to the Out of Work List in the hiring hall and the only way to get on the list was to sign it in person. (*See* doc. 306-11 at 3 ¶¶ 9–10; doc. 306-12 at 3 ¶¶ 9–10; doc. 306-13 at 4 ¶¶ 11–12; doc. 306-14 at 3–4 ¶¶ 9–10; doc. 305-15 at 3 ¶¶ 9–10). They each state that the flag "was no different than if [Local 91] had strung up a noose on the podium. They stand for the same thing." (*See* doc. 306-11 at 3 ¶ 10; doc. 306-12 at 3 ¶ 10; doc. 306-13 at 4 ¶ 12; doc. 306-14 at 4 ¶ 10; doc. 305-15 at 3 ¶ 10). Because each

plaintiff makes the same allegation regarding the Confederate flag, the court will address it globally for all Plaintiffs.

Viewing those declarations in the light most favorable to each plaintiff, the court will infer each plaintiff actually saw the Confederate flag, although that was not specifically alleged. The declarations also do not allege how frequently each plaintiff saw the flag; that omission is significant because the frequency of the harassing conduct is a factor in evaluating if a work environment is objectively hostile. (*See* doc. 306-11 at 3 ¶¶ 9–10; doc. 306-12 at 3 ¶¶ 9–10; doc. 306-13 at 4 ¶¶ 11–12; doc. 306-14 at 3–4 ¶¶ 9–10; doc. 305-15 at 3 ¶¶ 9–10); *Adams*, 754 F.3d at 1250. Although Plaintiffs mention they signed the Out of Work List "numerous times," they do not direct the court to any evidence that shows how frequently each plaintiff went to the hiring hall to sign the Out of Work list when the Confederate flag was present. (*See* doc. 309 at 40–44; *see, e.g.*, doc. 306-11 at 2 ¶ 6).

But even if the court assumes Plaintiffs saw the flag on a weekly basis, that alone would not be enough to establish a dispute concerning their work environments. In *Adams* a plaintiff failed to create a dispute concerning the objective hostility of his work environment even though he saw his coworkers wear the Confederate flag on a regular basis, saw racist graffiti in the restroom daily, heard people say the N-word occasionally, and heard about a noose in a breakroom. *See* 754 F.3d at 1254. In particular, the Eleventh Circuit found that the plaintiff's

"exposure to the Confederate flag was not directly humiliating or threatening." *Id.* Similarly here, Plaintiffs have presented no evidence that their occasional exposure to the flag was humiliating or threatening, as opposed to merely offensive. *See id.* at 1250–51 (distinguishing between physically threatening or humiliating conduct and "mere offensive utterance[s]"). Therefore, even if the court assumes the Plaintiffs saw the Confederate flag regularly, that fact alone cannot create a triable issue of fact on a hostile work environment.

*Anthony Robinson*

Mr. Robinson heard Walter Jones, another Local 91 member, ask at a meeting when the Confederate flag would be removed. (*See* 280-6 at 36–37; doc. 309 at 10 ¶ 10). An audience member responded that Mr. Jones would be removed before the flag was removed. (Doc. 280-6 at 37). The remainder of Mr. Robinson's experiences were at worksites: specifically, he heard racial slurs and saw graffiti but never reported the incidents to Local 91. (*See* doc. 280-6 at 41, 155–56; doc. 309 at 11–12 ¶ 13; doc. 372 at 14 ¶ 46).

None of those additional uncited facts establish a disputed issue of material fact about Mr. Robinson's work environment. The single incident of harassment was not directed toward him and was not made by his supervisor. *See Adams*, 754 F.3d at 1250–51, 1255. And the remainder of his allegations occurred at worksites which he never reported to Local 91. (*See* doc. 280-6 at 41). Accordingly, the court **WILL**

**GRANT** Local 91's motion for summary judgment on Mr. Robinson's hostile work environment theory of liability. (Doc. 272).

*Brian Struggs*

Mr. Struggs occasionally heard Local 91 members make "kind of racial jokes," but he could not give an example of a joke or remember who made the jokes. (*See* doc. 280-1 at 33–34). The remainder of Mr. Struggs's experiences occurred at worksites: specifically, he saw graffiti in a bathroom and, in 2000, a noose that was removed after it was reported. (*Id.* at 34–35; *see* doc. 309 at 11 ¶ 13; doc. 372 at 15 ¶¶ 51–52).

None of those additional uncited facts establish a disputed issue of material fact about Mr. Struggs's work environment. Even considering the incidents that occurred at worksites, those incidents were not frequent or directed toward him. *See Adams*, 754 F.3d at 1250–51, 1255. Accordingly, the court **WILL GRANT** Local 91's motion for summary judgment on Mr. Struggs's hostile work environment theory of liability. (Doc. 272).

*Nolan Jones*

Mr. Jones heard about the incident where a member told Walter Jones he would be removed before the Confederate flag would be removed; he testified the incident happened over ten years ago. (Doc. 278-6 at 24–25; *see* doc. 309 at 10–11 ¶¶ 10–11; doc. 273 at 16 ¶¶ 56–57). And Mr. Jones was shown pictures on the Local

91 Facebook page which showed the Confederate flag on the podium of the hiring hall. (*See* doc. 278-6 at 46; doc. 309 at 11 ¶ 13; doc. 273 at 16 ¶ 60). The remainder of Mr. Jones's experiences occurred at worksites: he generally heard racial slurs at different worksites. (Doc. 278-6 at 28; doc. 309 at 11 ¶ 13; doc. 273 at 16 ¶ 58).

None of those additional uncited facts create a dispute of material fact about Mr. Jones's work environment. The incident he overheard with Walter Jones was not directed toward him, was not made by his supervisor, and he did not witness it firsthand. *See Adams*, 754 F.3d at 1250–51, 1255. And even considering the instances at the worksites, that harassment was not pervasive or severe. *See Adams*, 754 F.3d at 1256–57. Accordingly, the court **WILL GRANT** Local 91's motion for summary judgment on Mr. Jones's hostile work environment theory of liability. (Doc. 272).

## Ronald King

In 2012, Mr. King was suspended from apprentice school because he told a business manager that the Confederate flag was offensive and asked that it be taken down. (*See* doc. 300-1 at 22–23; doc. 309 at 10–11 ¶¶ 10, 12; doc. 273 at 17 ¶ 67). In December 2015, Mr. King was referred to a SCMMA job where a white member was referred as foreman. (Doc. 290-14 at 4 ¶¶ 14–15, 18; *see* doc. 273 at 16 ¶¶ 61–62; doc. 309 at 7–8). And Mr. King saw a picture on the Local 91 Facebook page

that showed the Confederate flag on the podium of the union hall. (Doc. 300-1 at 39; *see* doc. 309 at 11 ¶ 13; doc. 273 at 17 ¶ 69).

None of those additional uncited facts create a dispute of material fact about Mr. King's work environment. The harassment Mr. King experienced was not frequent, severe, threatening, or humiliating. *See Adams*, 754 F.3d at 1250–51, 1255. Accordingly, the court **WILL GRANT** Local 91's motion for summary judgment on Mr. King's hostile work environment theory of liability. (Doc. 272).

### Chris Samuel

Sometime between 2005 and 2010, while Mr. Samuel was in apprentice school, a business agent told him he was acting insubordinate and made racially derogatory remarks toward him. (*See* doc. 282-7 at 6–7, 42–43; doc. 309 at 10–11 ¶¶ 10, 13; doc. 273 at 18–19 ¶¶ 74, 80). In January 2016 Mr. Samuel was referred to a SCMMA job and a white foreman was referred. (Doc. 290-14 at 5 ¶ 21–22; *see* doc. 273 at 18 ¶ 71; doc. 309 at 7–8). And Mr. Samuel saw some of the pictures of the Confederate flag in the hiring hall. (*See* doc. 282-7 at 48; doc. 309 at 7–8, 11 ¶ 13; doc. 372 at 19 ¶ 78). The remainder of Mr. Samuel's experiences occurred at a worksite: specifically, after white member told Mr. Samuel, "your mama don't work here. This ain't the hood," a foreman "gave [the white member] a pass on that" even though he acknowledged that he "should report him." (*See* doc. 282-7 at 44; doc. 309 at 7–8, 11 ¶ 13; doc. 273 at 18 ¶ 76). And Mr. Samuel heard a white

member use the N-word when talking to another white member, but he never reported the incident to Local 91. (*See* doc. 282-7 at 43; doc. 309 at 7–8, 11 ¶ 13, doc. 273 at 18 ¶ 75).

None of those additional uncited facts create a dispute issue of material fact about Mr. Samuel's work environment. The harassment Mr. Samuel experienced was not frequent, severe, threatening, or humiliating, even considering the instances that occurred at worksites. *See Adams*, 754 F.3d at 1250–51, 1255. Accordingly, the court **WILL GRANT** Local 91's motion for summary judgment on Mr. Samuel's hostile work environment theory of liability. (Doc. 272).

### b. *Count 4(b) – UA (Hostile Work Environment)*

Because the court has found no Plaintiff has created a triable issue of fact on whether any of the Plaintiffs' work environments were hostile, the court **WILL GRANT** UA's motion for summary judgment on Plaintiffs' hostile work environment theory of liability. (Doc. 274).

### III.   CONCLUSION

The court **WILL GRANT** Local 91's (doc. 272) and UA's (doc. 274) motions for summary judgment. The court **FINDS AS MOOT** Local 91 and UA's motion for reconsideration from the court's earlier order granting Plaintiff's motion to strike evidence. (Doc. 360).

The court will enter a separate summary judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this October 7, 2024.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE